PEOPLE v. KELLER.

1. HOMICIDE—ACCESSORY AFTER FACT—EVIDENCE AS TO RELATIONS COMPETENT.

In prosecution for being accessory to murder after fact, it was competent for people to show murderer's character and defendant's intimacy with him as bearing not only on her knowledge that he committed said crime, but also on probability that she would harbor him and assist in enabling him to escape conviction.

On evidence and instructions as to character of accused, see annotation in 20 L. R. A. 609.

2. SAME—IRRELEVANT TESTIMONY—CRIMINAL LAW.

While irrelevant testimony as to immorality of defendant's sister should have been excluded, its admission was not reversible error, where defendant's immorality was well known to jury from other competent evidence.

3. SAME—EVIDENCE.

Testimony that witness saw murderer's shoes at defendant's house, that they looked as though they had been washed, and aroused his suspicions, *held*, incompetent, where testimony shows that defendant, charged with being accessory after fact, was not present at that time and did not go to the house at all that day, and there is nothing to show that she saw shoes or was present when she could have seen them.

4. SAME—IMPEACHMENT.

In prosecution for being accessory to murder after fact, testimony by murderer's mother that, on certain day, defendant told her that son was going to claim that he was home on night of murder and for mother to claim same thing, although it was false, *held*, material matter, and therefore it was error to exclude testimony of officers that, previous to said day, mother had told them that son was home that night; said testimony being fair impeachment.

Appeal from Washtenaw; Sample (George W.), J. Submitted October 13, 1932. (Docket No. 198, Calendar No. 36,367.) Decided January 3, 1933.

Katherine Keller was convicted of being an accessory to murder after fact. Reversed, and new trial granted.

*Grommon & Huggett*, for appellant.

*Paul W. Voorhies*, Attorney General, *Edward A. Bilitzke*, Assistant Attorney General, and *Albert J. Rapp*, Prosecuting Attorney, for the people.

McDONALD, C. J. The defendant was convicted of being an accessory after the fact to the murder of Harry Lore by Fred Smith.

It was charged in the information that, knowing Fred Smith had committed the murder, she did "feloniously conceal, harbor, maintain and assist" him with intent to aid him in escaping arrest, trial, and punishment.

On the night of August 11, 1931, four young people, two boys and two girls, were taken from a parked automobile in Peninsular Grove near Ypsilanti, Michigan, and brutally murdered by Fred Smith, David Blackstone, and Frank Oliver. In a few days the murderers were apprehended, confessed their guilt, and were sentenced to prison for life. Blackstone was a colored man. He and Fred Smith had served terms in prison for other crimes. Katherine Keller, the defendant, was acquainted with these men. She and Fred Smith were sweethearts. For a considerable period prior to the murder they had carried on an intimate physical friendship. At the time of the murder and for some time previous thereto, the defendant was employed in the home of Mr. and Mrs. John Wigget at Ypsilanti. She and Fred Smith were together nearly every night. She owned a home on Grant street which was not occupied, where they were accustomed to meet and where at times they held gay parties with persons of like character. The crime for which Fred Smith was convicted was committed some time in the night of Monday, August 11, 1931. The people claim that defendant was with Smith and Oliver until 9:30 o'clock that night; that on the previous Sunday evening she was riding with Smith, Oliver, and Blackstone; that they stopped at a garage where Blackstone got a flashlight; that from there they drove to a certain street and parked the car while Smith and Blackstone went away together; that the defendant expressed to the driver her fears that they had gone to hold up some one; that immedi-

ately after the murder Smith went to her home on Grant street; that she went there to see him in the evening; that she was in his company again on Wednesday evening and was seen in earnest conversation with him by other parties who were present; that Smith was arrested on Thursday in the forenoon; that after his arrest the defendant, in a telephone conversation with Smith's mother, told her that Smith was going to tell the officers that he stayed all night at his mother's home the night of the murder; that when interviewed by an officer, the defendant gave him a shirt and pair of trousers which she said Smith had worn the night of the murder; that they were not the clothes worn by Smith but were so represented by her to deceive the officers and assist Smith in escaping conviction; that she was taken by the officers to the Ann Arbor jail where Smith was confined after his arrest; that Smith told her he had committed the crime; that she was driven back to Ypsilanti by two young men to whom she profanely berated the officers, said she had told them nothing and thought it would be best for her to get out of town until the thing blew over; that after the murder she took a gun from her house on Grant street to the place where she was working, and called a Mrs. Hart and told her not to tell the name of the man she was out with on the evening of the murder. These claims with explanations and denials by the defendant were submitted to the jury as evidence to warrant a conviction on the offense charged in the information.

The defendant has assigned error on rulings of the court permitting in evidence many acts and circumstances showing defendant's association and intimacy with Fred Smith prior to the murder.

It was competent for the people to show Smith's character and defendant's intimacy with him as bearing not only on her knowledge that he committed the crime but also on the probability that she would harbor him and assist in enabling him to escape conviction.

The testimony of Madden Duty as to certain acts that took place in defendant's Grant street house was not competent and should not have been admitted. The people called Mr. Duty as their witness and he was permitted to testify that about two months previous he stayed all night at the Grant street house; that in the night Eunice Keller, a sister of defendant, came to his bed; that they had sexual intercourse; that she became pregnant and in due time a child was born. This testimony was wholly irrelevant and should have been excluded, but we are not inclined to hold it ground for reversal. The immorality of the defendant was so well known to the jury from other competent evidence that one more immoral act from another member of the family could not have injuriously affected her standing.

Burt Curtis, a witness called by the people, testified that he was at the Grant house on Tuesday morning following the murder; that he saw Smith lying on the davenport; that witness was there again in the early evening and saw a pair of oxford shoes belonging to Fred Smith who was looking them over; that to the witness they looked as though they had been washed; that his suspicions were aroused and he reported what he had seen to the chief of police.

The testimony shows that the defendant was not present at that time and did not go to the house at all during the day but was there later in the even-

ing. There is no testimony that she had seen the shoes or knew of their condition. The testimony was offered as a circumstance tending to establish the people's claim that defendant had knowledge of Smith's guilt. If the condition of the shoes was such as to raise a suspicion in the mind of Mr. Curtis that Fred Smith was connected with the murder, it probably would have had a like effect on the defendant; but, in the absence of some evidence that she saw the shoes or was present when she might have seen them, it would have no tendency to establish her knowledge of Smith's guilt. Without in some way connecting the defendant with knowledge of the condition of the shoes, the testimony was incompetent and should not have been received.

The defendant offered to prove by two officers, Louis Chamberlain and George Fram, that on Wednesday following the murder they went to the home of Fred Smith's parents to question him as to his whereabouts on the night of the murder and were told by Luella Smith, Fred's mother, that he stayed at her home that night. Their testimony was excluded on the ground that it was offered in impeachment of Luella Smith on a collateral matter. On its exclusion defendant has assigned error.

Luella Smith testified on direct examination that, on Wednesday following the murder, she had a telephone conversation with the defendant in which she said to defendant that the officers were going to question Fred and unless he could prove where he was on Monday night they would have something on him. She also testified to another conversation with defendant on the next day following Fred's arrest, in which defendant told her that Fred was going to tell the officers that he stayed at his mother's home that night. This testimony was offered by the

people to show that defendant was endeavoring to assist Fred Smith in escaping conviction by suggesting to his mother that she should say Fred stayed at her home the night of the murder. It was the defendant's claim that she did not make that statement to Luella Smith, and in proof thereof offered to show by the two officers that, on the day previous to the alleged conversation, Luella Smith was claiming to the officers that Fred stayed at her home on the night of the murder. Defendant was charged with harboring Fred Smith and assisting him to escape conviction by framing a story that he stayed at his mother's that night. Where he stayed on Monday night was material to the issue. What the people claim defendant told Fred's mother about it was also material. So when the defendant's counsel cross-examined Luella Smith as to these claims and what she told the officers about them, they were interrogating her in regard to material matters. The defendant was not bound by her answers. The testimony of the officers was a fair impeachment. In excluding it the court erred.

We find no other serious errors, but, as a new trial must be granted, it may be helpful to refer in a general way only to other assignments. The question of intent was involved, and defendant should have been permitted to say whether certain acts of Fred Smith created any suspicion in her mind that he was implicated in the murder.

In a case involving this charge, where the prosecution must depend on numerous circumstances to establish guilt, the testimony necessarily covers a wide range; but, in respect to some matters, we think it went far afield. For instance: The testimony of Mrs. Smith in regard to indecent pictures was carried beyond what was necessary to show

intimacy between Fred Smith and the defendant; cross-examination of the defendant concerning a letter which she received from Eunice Keller asking for suggestions to relieve herself of pregnancy; and the testimony of Madden Duty as to his illicit relations with defendant's sister Eunice were not material to any issue and should have been excluded. Considered independently, these matters may not have been sufficiently prejudicial to warrant reversal, but, in combination, their effect must have been to create a courtroom atmosphere at least unfriendly to the defendant. The trial of the case followed closely an atrocious murder. The defendant's prior intimacy with those concerned in that crime placed her in an unfavorable light with the jury, and it should not have been augmented by matters which reflected on her and shed no light on the issue.

Under difficult circumstances the record shows that the circuit judge was painstaking in his effort to give the defendant a fair and impartial trial. His charge was clear and fair, and in the main on his part the trial was well conducted. But the record also shows errors on account of which the judgment of conviction must be reversed. It is reversed, and a new trial granted.

CLARK, POTTER, SHARPE, NORTH, FEAD, WIEST, and BUTZEL, JJ., concurred.