PEOPLE *v.* THOMAS.

1. CRIMINAL   LAW—EVIDENCE—IMPEACHMENT—HEARSAY—CONFRON-
TATION OF WITNESSES.

Repeated references to statement, made by a people's witness to
prosecutor shortly after occurrence of homicide, under guise
of refreshing the recollection of the witness as to statements
she had made not in the presence of defendant on trial for
murder, which statements were most damaging to such de-
fendant, *held,* reversible error when permitted notwithstanding
objections that basis for impeachment testimony had not been
laid, since it put hearsay evidence before jury (US Const,
am 6; Mich Const 1908, art 2, § 19).

2. WITNESSES—REFRESHING RECOLLECTION.

The recollection of a witness may properly be refreshed by
permitting him to read the document intended to trigger the
memory and thereby not have the content go before the
jury, or the jury may be excused and the document read to
him.

---

REFERENCES FOR POINTS IN HEADNOTES

[1]  58 Am Jur, Witnesses §§ 578, 798, 802.
Right of party surprised by unfavorable testimony of own wit-
ness to ask him concerning previous inconsistent statements.
74 ALR 1042.
[2, 3]  58 Am Jur, Witnesses §§ 598, 599.
Refreshment of recollection by use of memoranda or other writ-
ings.  125 ALR 19.
[4]  58 Am Jur, Witnesses § 802.

3. SAME—REFRESHING RECOLLECTION.

It is error to permit the prosecution on a criminal trial, against defendant's objection, without occasion for refreshing recollection of a witness, to read to him, while on the stand and in the presence of the jury, his evidence given on a previous occasion and then to ask whether, having heard it read, he recollected certain facts stated in it.

4. SAME—IMPEACHMENT—REFRESHING RECOLLECTION.

Reception in evidence of hearsay testimony materially damaging to defendant in trial for murder of what was in fact impeachment testimony, under the pretense it was to refresh the recollection of people's principal witness, who had lived with defendant before living with deceased, without having laid a foundation for impeachment, was reversible error.

Appeal from Recorder's Court for the City of Detroit; Schemanske (Frank G.), J. Submitted January 14, 1960. (Docket No. 66, Calendar No. 48,079.) Decided April 11, 1960.

John Thomas was convicted of murder in the second degree. Reversed and remanded for new trial.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *Samuel H. Olsen,* Prosecuting Attorney, *Samuel Brezner* and *Angelo A. Pentolino,* Assistant Prosecuting Attorneys, for the people.

*Rothe, Marston, Mazey, Sachs & O'Connell* (*Nicholas J. Rothe,* of counsel), for defendant.

SMITH, J. This case comes to us upon leave granted. The defendant was found guilty of murder in the second degree.

The principal witness for the State was Joyce Dancer. She had been living with the defendant in a hotel in the city of Detroit for a period of some 18 months. Shortly after leaving him she moved into

another hotel with the deceased, David Mack. That evening defendant came to the door, obtained admittance, and engaged in an altercation with the deceased. As the disputants were "scuffling" on the floor, the witness testified that she saw a knife, though she was not sure who had it. She saw that the deceased had been cut and—

"After that I opened the door. I was trying to get the operator on the telephone but no one answered. John Thomas told me to get away from the phone. I went to the door and opened it and Mack got up and went out, ran into the hallway, and that is the last time I saw him. John Thomas took me by the arm and we went out the back. He had a butcher knife. He said I was coming with him. He didn't say anything else."

Defendant took her down the back stairs and for some distance with him.

"We walked," she testified, "about 2 blocks through yards and across the street. We climbed one fence. I think he hit me once, because I spit at him. It was dark. We went right off the alley behind some houses in a yard. We were talking about what had happened and what John was going to do. Then John went off and told me to go back to the hotel. I went back to the hotel and the detectives were there and I went to the prosecuting attorney's office and made a statement."

It is concerning the use of this statement that appellant's most serious allegations of error arise.

During the examination of Mrs. Dancer the prosecutor was permitted to read to her, in the presence of the jury, much of a statement she had made to an assistant prosecuting attorney some 3 years prior thereto under the aforedescribed circumstances. Interspersed in such reading were occasional questions to the witness, asking if she had not been so questioned and had not made such replies. The following

is the form of the examination employed, the quotation marks indicating the questions and answers taken from the prior statement, unless the context indicates otherwise:

*A.* * * * I heard some scuffling while in the closet, and when I came out I saw Thomas and Mack fighting, kind of wrestling around.

*Q.* Well, what do you mean "wrestling around"?

*A.* Fighting, I guess you would call it.

*Q.* Well, were they striking any blows or what?

*A.* It all happened so fast I don't remember.

*Q.* You don't remember?

*A.* No.

*Q.* Well, now, let me refresh your recollection, witness. You made a statement in the prosecuting attorney's office? I beg your pardon?

*A.* Yes, sir.

*Q.* Well, aren't you sure?

*A.* Yes, sir.

*Q.* And that was on Friday, June 19, 1953, at the approximate time of 12:45 a.m.?

*A.* Yes, sir.

*Q.* Isn't that true?

*A.* Yes, sir.

*Q.* That was after midnight, after this happened, isn't that true?

*A.* Yes, sir.

*Q.* Was this question asked you and did you make this answer—

*Mr. Rothe* (interposing): If the court please, I don't believe any sufficient ground has been shown to impeach this witness at this point.

*The Court:* He has a right to refreshen the witness' memory, however.

*Mr. Rothe:* Well, I don't know what he is refreshing it with. There appears to be a statement made—

*The Court* (interposing): Well, he, presumably will turn it over to you after he gets through so you will have an opportunity to examine it. Is it for the purpose of refreshing her memory, Mr. Prosecutor?

*Mr. Kotelly:* Yes, sir.

*The Court:* All right, go ahead.

Q. Was this question asked you by Mr. Stanczyk, assistant prosecuting attorney, on the early morning of the 19th day of June, 1953, and did you make this answer:

"Q. What happened?

"A. Well, we were sitting on the bed talking, and Mack said he was going to go out to get a job. I was planning to go back to work myself, and we were sitting there talking, and somebody knocked at the door. Mack asked who it was and somebody said 'Bellboy.' All I had on was my brassiere and a slip. I got up and went behind the bed to the closet to get this robe while he opened the door. When he opened the door, John came in. I didn't hear the first words that they said, but I grabbed my robe and came out. He said 'I know you are in there, Joyce, come on out.' So, I came on out. He grabbed hold of Mack and was threatening him. He said he was going to kill both of us. I don't remember all the words that were said."

Q. Did you make that answer to that question?

A. I might have; I don't remember; I was half hysterical that night.

Q. Did you make that answer to that question, witness?

A. I don't know; I guess so.

Q. Do you remember that?

A. No sir, I don't.

Q. If you did make that answer to that question, was that the truth?

A. I don't know.

Q. I beg pardon?

A. I don't remember; I was half hysterical that night and I don't know what was happening in there.

Q. Well, you were in the prosecuting attorney's office, isn't that true?

A. Yes, sir.

Q. And the assistant prosecuting attorney asked you to tell what happened?

A. Yes, sir.

*Q.* And did he ask you that question, "What happened?"

*A.* I guess he did.

*Q.* And you told him what happened, isn't that true?

*A.* Yes, sir.

*Q.* And what you told him was the truth, wasn't it?

*A.* I guess it must have been.

*Q.* Well, wasn't it?

*A.* I,—Well, I guess so.   *   *   *

*Q.* Now, what did you see when you came out of there?

*A.* I saw David and John scuffling.

*Q.* Did you see anything else?

*A.* No.

*Q.* Did you see a weapon?

*A.* I saw a knife.

*Q.* Who had the knife?

*A.* That I am not sure of, either. They were—had their arms around each other.

*Q.* Well, now, let me refresh your recollection again. Was this question asked of you and did you make this answer:

"*Q.* Did you see a weapon at that time?

"*A.* Yes, he had a butcher-knife in his hand."

Did you make that answer to that question?

*A.* Yes, sir.

*Q.* And if you made that answer to that question, was that the truth?

*A.* Yes, sir.   *   *   *

*Q.* Did you say anything when you came out of the closet or the back room?

*A.* I hollered at them to stop fighting.

*Q.* To whom did you holler to stop fighting?

*A.* John and David both.

*Q.* Well, now, let me refresh your recollection, witness. Did you make this answer to the question— was this question asked and did you make this answer:

"*Q.* How large a butcher-knife would you say it was?

"*A.* About like that (indicating).

"*Q.* About 10 or 12 inches?

"*A.* Yes. So he grabbed Mack and got me out and told us not to start any trouble, that we could sit and talk about it. He said he wasn't going to talk about nothing. He said he was going to kill both of us, and that was it, and really, I don't remember just exactly what happened. I guess Mack must have tried to get away from him, or something, because they started fighting. He got Mack on the floor and started to stab him with the knife, you know. I don't know whether it was in the front or back. I know he hit him one time. I saw the cut and the blood was spurting out of Mack. I tried to pull John off of him and he wouldn't let go. I grabbed the phone and tried to call the desk. They are so slow in answering—"

*Mr. Rothe* (interposing): I object to all of this, if the court please, as being highly improper. It isn't the proper way to refreshen the witness' recollection.

*The Court:* The only trouble—the objection is good for this reason: You see, you haven't followed her testimony on direct examination here on the stand. If you permit her to tell the story as she tells it, and, then, if you find that you want to use the statement to refresh her memory, then you have a perfect right to do it, but she hasn't related here from her independent knowledge of the facts in the case as they appear in the room. You have only got as far as the fact that they grabbed for the knife; that is as far as you have got. Now, you haven't followed it through.

*Mr. Kotelly:* You see, this is the answer that she made to the question, and I just wanted to complete the answer to the question.

*The Court:* No, his objection is that you are refreshing her memory as to other activity when you haven't asked her directly on the examination here in the case, and that is where the objection is good and valid. Now, until she relates what she remembers of her independent recollection and, then, if

you find it is different, you have a right to refresh her memory from the statement.

*Mr. Kotelly:* All right.

*Q.* So, did you hear John Thomas say anything?

*A.* I don't remember. I will tell you the truth.

*Q.* Beg pardon?

*A.* I don't remember.

*Q.* Well, you remember saying to the assistant prosecutor, Mr. Stanczyk, that, "He said he was going to kill both of us, and that was it?" Do you remember that?

*A.* I might have said it; I don't know.

*Q.* Well, does that refresh your recollection, witness?

*A.* No sir, it doesn't.

*Q.* It doesn't refresh your recollection? Well, if you said that to the assistant prosecuting attorney at the time he was questioning you, was that the truth?

*A.* I guess it was; I don't know for sure, myself, now.

*Q.* Well, if you said it at the time, witness, was that the truth?

*Mr. Rothe:* I submit that the witness has answered that question. She has said that she was hysterical, that she doesn't remember exactly what was said; that she might have said a lot of things. She has answered that 2 or 3 times.

*The Court:* I know, but the examination is proper. She made a statement to the prosecuting attorney shortly after the offense was committed, the alleged offense; and if she made the statement the prosecutor has a right to know why she said it, if it was made at that time. It is proper. Go ahead.

*Q.* Well, do you remember making that statement to the assistant prosecuting attorney?

A. I don't remember.

*Mr. Rothe:* I shall object to the statement she made to the assistant prosecutor, if the court please, any statement she made, as not binding on this defendant because it wasn't made in his presence.

*The Court:* No, the examination is proper. Go ahead. I will overrule the objection.

Q. Did you make that statement to the assistant prosecuting attorney?

A. I guess so.

Q. And if you did make that statement, was that the truth?

A. I suppose I thought it was at the time.

Q. Beg pardon?

A. I suppose I thought it was at the time. * * *

Q. Well, did you see Mr. David,—I mean, David Mack try to get away from there?

A. I don't know whether he was trying to get away or not. They was just fighting, that is all.

Q. Well, didn't you give this answer to that same question to the assistant prosecuting attorney, Mr. Stanczyk:

"I guess Mack must have tried to get away from him or something because they started fighting"?

Do you remember that?

A. I don't remember my exact words that night.

Q. Well, do you remember making a statement at the prosecuting attorney's office?

A. I remember making a statement, yes.

Q. And if you said that to the assistant prosecuting attorney, who was questioning you at that time, was that the truth?

A. I suppose it was, yes, sir. * * *

Q. Now, following the same thought, witness, reading from the same answer to the same question in the statement that you made in the prosecuting attorney's office, do you remember telling him this:

"A. He got Mack down on the floor and started stabbing him with the knife, you know"?

A. No, sir.

Q. You don't remember that?

A. No, sir, because he didn't start stabbing him. I mean I couldn't see him just stabbing at him.

"Q. He got Mack down on the floor?

"A. They were both on the floor."

*Q.* Did you make this answer to that question to the assistant prosecuting attorney, witness?

*A.* I guess I did.

*Q.* Well, if you did, was that the truth?

*A.* I don't know—no, it wasn't the truth.

*Q.* It wasn't the truth?

*A.* No, because I didn't see him stabbing him.

*Q.* Well, I asked you if you remember telling him that, witness?

*A.* No, I don't remember telling him that.

*Q.* Well, now, I am asking you, if you did tell him that, was that the truth?

*A.* No, it couldn't have been.

*Mr. Rothe:* I submit that has been asked and answered.

*Q.* It couldn't have been?

*Mr. Rothe:* She said that it wasn't.

*A.* I didn't see him stabbing him.

*Q.* All right. Then, what did you see happen after that, after they were on the floor?

*A.* I didn't see any—they were just fighting and I was trying to get them apart, and then I opened the door and David got up and ran out.

*Q.* And did you see any cutting?

*A.* Not the cut, no. When I looked at David, he was bleeding, and that is all I know about it.

*Q.* Well, did you see John Thomas hit David Mack?

*A.* No, sir.

*Q.* Now, let me refresh your recollection again. Did you make this answer to this question, reading from the same answer, or a continuation of the same answer to that same question:

"*A.* He got Mack down on the floor and started stabbing him with a knife, you know. I don't know whether it was in the front or back. I know he hit him one time."

*Q.* Do you remember making that answer to that question?

*A.* No, sir, I don't remember that.

*Q.* Well, if you did make that answer to that question, was that the truth?

*A.* I may have thought so at the time; I don't know. I don't remember too much about what happened after that or what I said on my statement, either.

*Q.* Now, do you remember telling him this, following the same trend of thought or the same answer to the same question:

"*A.* I saw the cut and the blood was spurting out of Mack"?

*A.* I remember saying that.

I just saw the cut. I don't know how it got there. After that I opened the door. I was trying to get the operator on the telephone but no one answered. John Thomas told me to get away from the phone. I went to the door and opened it and Mack got up and went out, ran into the hallway, and that is the last time I saw him. John Thomas took me by the arm and we went out the back. He had a butcher knife. He said I was coming with him. He didn't say anything else.

*Q.* I beg pardon?

*A.* I don't remember whether he did or not. I suppose he did.

*Q.* Well now, to refresh your recollection, witness, reading from the same question and the same answer:

"*A.* When Mack ran out the door he said 'I'm not going to have any cops after me. I will take you out and kill you, too.' He dragged me down the back stairs by the arms and tore all the buttons off my coat, practically."

Did you make that answer to that question?

*A.* I guess so.

*Q.* And if you made that answer to that question, was that the truth?

*A.* Yes, sir.

*Q.* I beg pardon?

*A.* Yes, sir.

We will not quote more of the testimony. It was all of a piece, page after page of readings from the witness' statement followed by challenges of her

veracity with respect thereto. We will assume with the State in what follows, though it is far from clear on the record, that there had in fact been an exhaustion of the memory of the witness, the situation in which a dormant or latent recollection may be stimulated by apt association. So viewed, the procedure employed was an affront to the Bill of Rights. The prosecutor was permitted to place before the jury statements most damaging to the defendant, made in the late hours of the night by a woman who had undergone a shattering emotional experience, when, obviously, the defendant was not present and thus could neither confront nor cross-examine his accuser. Such procedure is forbidden by both the State[1] and the Federal Constitutions.[2] It opens the door "to the admission of hearsay and manufactured evidence without limit."[3] We are careful to note that although the instant case involves hearsay it contains no hint of "manufactured" evidence. In the next the defendant may not be so fortunate, once we throw open the door. The fact that the trial court at the close of the trial instructed the jury that Mrs. Dancer's answers to the assistant prosecutor were to be considered by them only as testing her credibility, and not as substantive evidence, rendered them none-theless hearsay the most flagrant and damaging.

We are not, of course, holding that the memory of a witness may not be refreshed, but the purpose of refreshing is to awaken the memory, not to impeach or contradict the witness. The evidentiary procedures for the refreshing of memory do not require recitation by this Court. They were not followed. If, in truth, it is the desire of counsel merely to "refresh" the recollection of a witness it may be done by permitting the witness himself to read the

---

[1] Mich Const 1908, art 2, § 19.

[2] United States Const, am 6.

[3] *Estate of Packer*, 164 Cal 525, 530 (129 P 778, 780).

document intended to trigger the memory,[4] under which procedure, of course, its content does not go before the jury, or to withdraw the jury and read the statement aloud,[5] the procedure necessarily employed when the witness is blind or illiterate.[6] Either procedure accomplishes the refreshing of memory, if that is, in truth, the purpose, and that without compromising the fundamental guaranties of a citizen accused of crime. Mr. Justice COOLEY, speaking for the Court in 1872, held[7] that (syllabus):

"It is error to permit the prosecution on a criminal trial, against the objection of the prisoner, under pretense of refreshing the recollection of a witness, but where there is no occasion for doing anything by way of refreshing his recollection, to read to him while on the stand, and in presence of the jury, his evidence given on a previous occasion, and then ask him whether, after having heard it read, he recollected certain facts stated in it."

The ancient ruling turned upon a consideration no less controlling today than it was almost a hundred years ago, namely, that the procedure employed "was eminently unfair to the prisoner."

The brief of the people discloses some confusion between refreshing the memory of a witness and impeaching the witness. That the trial court and the prosecutor were proceeding upon a theory of refreshing the memory appears repeatedly throughout the record as the excerpts heretofore quoted amply disclose. That the choice between procedures for impeachment and for refreshing the memory was

---

[4] *State* v. *Legg,* 59 W Va 315 (53 SE 545, 3 LRA NS 1152), held, error to read to witness in presence of jury.

[5] *State* v. *Walters,* 145 La 209 (82 So 197); *Kirkland* v. *State,* 86 Tex Crim 595 (218 SW 367); *State* v. *DePriest,* 288 Mo 459 (232 SW 83).

[6] *Commonwealth* v. *Fox,* 73 Mass 585; *Cf. Catt* v. *Howard,* 3 Stark 3 (171 Eng Rep 747), cited in 3 UCLA L Rev 616, 618.

[7] *Bashford* v. *People,* 24 Mich 244 (Syllabus 2).

deliberately made also appears. Thus, in response to the first objection (see portion of transcript, *supra*), that no sufficient foundation had been laid "to impeach this witness," the court responded that, "He [the prosecutor] has a right to refreshen the witness' memory, however," and thereupon and thereafter permitted lengthy readings from the statement made, with repeated challenges of veracity of the witness with respect thereto as a "refreshing of memory." What was actually being accomplished, however, was impeachment, but the testimony was neither offered nor received for such purpose, and defense counsel was correct in objecting that no proper foundation had been laid therefor.

Under our view of the case it is unnecessary to rule upon the effect of the trial court's acceptance of information respecting the case from sources outside the record[8] though we view it with profound disapproval, nor need we add to what we said in *People* v. *Cole,* 349 Mich 175, concerning the atmosphere in which a case must be tried.

Reversed and remanded for new trial.

Dethmers, C. J., and Carr, Kelly, Black, Edwards, Kavanagh, and Souris, JJ., concurred.

---

[8] *"The court:* Well, the information that I have from the officer in charge of the case is that she has a husband and he has a wife. So, how could there be a common-law marriage."