PEOPLE *v.* RODGERS

OPINION OF THE COURT

1. EVIDENCE—HEARSAY—IMPEACHMENT.

   Testimony which is not offered to prove the truth or falsity of a witness's testimony but to contradict it is not hearsay as that term is used in the law of evidence.

2. EVIDENCE—IMPEACHMENT—MEMORANDUM.

   The contents of a memorandum containing a verbatim tran-

REFERENCES FOR POINTS IN HEADNOTES

[1] 29 Am Jur 2d, Evidence §§ 493, 497.
[2–5, 7, 9] 58 Am Jur, Witnesses §§ 688, 767–791.
[6] 53 Am Jur, Trial § 670.
[8, 10] 58 Am Jur, Witnesses §§ 688, 767–791.
   29 Am Jur 2d, Evidence §§ 493, 497.
[11–14] 58 Am Jur, Witnesses § 529 *et seq.*
   29 Am Jur 2d, Evidence §§ 876, 877.

scription of a witness's prior inconsistent out-of-court statement to the police are admissible to impeach the witness where a proper foundation is laid.

3. WITNESSES—IMPEACHMENT—PRIOR INCONSISTENT STATEMENT.

A witness may be impeached by showing that his testimony upon a material matter is inconsistent with a prior statement made by him.

4. WITNESSES—IMPEACHMENT—PRIOR INCONSISTENT STATEMENTS.

A witness may be impeached by producing written statements which are inconsistent with the testimony given at trial and a written statement made at the direction of the witness to be later used to impeach his prior testimony.

5. WITNESSES—IMPEACHMENT—PRIOR INCONSISTENT STATEMENTS.

A police officer's written memorandum of his interview with a witness which contradicts the witness's in-court testimony is admissible for purposes of impeachment regardless of whether the memorandum is a verbatim transcription of the interview or the conclusions of the police officer.

6. WITNESSES—IMPEACHMENT—PRIOR INCONSISTENT STATEMENTS— INSTRUCTIONS TO JURY.

Instruction to the jury that a witness's prior inconsistent statement as testified to by a police officer could only be considered to test the credibility of the witness and could neither be considered for its truth nor as substantive evidence was correct.

DISSENT BY LEVIN, J.

7. WITNESSES—IMPEACHMENT—PRIOR INCONSISTENT STATEMENTS.

*The people are entitled to impeach the credibility of a witness who testified in support of a defendant's alibi by showing that he told a story to the police which was inconsistent with his testimony at trial.*

8. EVIDENCE—PRIOR INCONSISTENT STATEMENTS—HEARSAY.

*A witness's out-of-court inconsistent statement offered to impeach his credibility is not regarded as hearsay because it is not offered as substantive evidence to prove the truth of the statement attributed but rather to discredit the witness's at-trial testimony.*

9. EVIDENCE — PRIOR INCONSISTENT STATEMENT — MEMORANDUM — FOUNDATION.

   *The fact that a prior inconsistent statement was made must be proved before the statement is admissible in evidence.*

10. EVIDENCE—PRIOR INCONSISTENT STATEMENTS—MEMORANDUM—ADMISSIBILITY.

   *An unsigned written memorandum made by the hearer of a witness's prior inconsistent out-of-court statement is hearsay, regardless of whether the statement recorded in it is offered as substantive evidence or for the purpose of impeaching a witness's at-trial testimony, because the writing is an out-of-court statement by its writer that the other person said what is contained in the writing.*

11. EVIDENCE—MEMORANDUM—ADMISSIBILITY.

   *A witness who does not have a present recollection of facts about which he is to testify may refer to a written memorandum to refresh his recollection, and when he speaks from a memory thus revived his testimony is what he says, not the writing; therefore a party who uses a memorandum to refresh the memory of a witness may not introduce the writing in evidence or have it read to the jury.*

12. EVIDENCE—MEMORANDUM—ADMISSIBILITY.

   *A writing may be introduced in evidence under the past recollection recorded exception to the hearsay rule only where the witness has no present recollection of the facts and, upon reference to the document, his memory is not refreshed; it is the writing, not refreshed recollection, that is the evidence.*

13. EVIDENCE—PRIOR INCONSISTENT STATEMENTS—MEMORANDUM—ADMISSIBILITY.

   *It was error to permit a police officer to read a written memorandum of a witness's prior inconsistent statement, without regard to whether the statement was offered to impeach the witness's credibility, where the memorandum was unsigned by the witness and was taken only three days before the officer testified, and where the officer was neither asked if he had any present recollection of what the witness had said nor if his recollection could be refreshed by reference to the writing.*

14. EVIDENCE—PRIOR INCONSISTENT STATEMENT—MEMORANDUM—ADMISSIBILITY.

   *Permitting a police officer to read into evidence his written memorandum of a witness's prior inconsistent statement was not*

*harmless error where there was a close factual question on
the identity of the defendant as one of those who beat and
robbed the complaining witness for the jury to decide, the
defense was alibi, and where the reading of the memorandum
tended to discredit not only the witness being impeached by
the statement, but all of the defendant's alibi witnesses.*

Appeal from Wayne, James L. Ryan, J. Sub-
mitted Division 1 February 4, 1971, at Detroit.
(Docket No. 8675.) Decided October 1, 1971. Leave
to appeal granted December 16, 1971, 386 Mich 776.

Larry D. Rodgers was convicted of armed robbery.
Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *William L. Cahalan,*
Prosecuting Attorney, *Dominick R. Carnovale,*
Chief, Appellate Department, and *Thomas P. Smith,*
Assistant Prosecuting Attorney, for the people.

*Samuel A. Turner,* for defendant on appeal.

Before: J. H. GILLIS, P. J., and R. B. BURNS and
LEVIN, JJ.

J. H. GILLIS, P. J. Defendant, Larry Douglas
Rodgers, appeals his conviction by a jury of the
offense of robbery armed.[1] The offense occurred on
March 7, 1969, at approximately 8:40 p.m. in the
City of Ecorse, Michigan.

The victim testified that while he was driving his
automobile it was bumped from behind by another
vehicle. The complainant observed that the car
which struck him had no lights on and he imme-
diately pulled to the curb. The other car pulled

---

[1] MCLA § 750.529 (Stat Ann 1971 Cum Supp § 28.797).

parallel to complainant's car. Mr. Walker, the complainant, rolled down the window and noticed that the other car was occupied by five or six men. One man, sitting in the right front seat of the striking vehicle, said "We don't think there is much damage". Mr. Walker got out of his car to inspect the damage; he left his vehicle running and the lights on. Mr. Walker stated that one of the occupants of the striking automobile ran past him just as he reached the rear of his car to inspect the damage. This individual got into Mr. Walker's car, and when Mr. Walker rushed back this person leaped out with a gun in hand. The gun wielder pointed it at Mr. Walker saying, "I got a gun, I got a gun". The complainant testified that the remaining occupants of the striking vehicle got out of their car and began "working me over", and one of them took the complainant's wallet from his back right pocket. Mr. Walker identified the person with the gun as defendant, Larry Douglas Rodgers, and testified. that the defendant pointed the gun at complainant's face and struck him with it. The assailants attempted to force Mr. Walker into his own automobile, but Mr. Walker ran from them at his first opportunity. After he traveled about 25 or 30 feet, he was shot in the back. The bullet struck about an inch from the spine at belt level. Mr. Walker ran to the nearest house where the occupants summoned police.

Patrolman Ohannasian of the Melvindale Police Department testified that on the morning of March 8, 1969, at approximately 12:45 a.m., he and his partner drove into a White Castle restaurant parking lot where he observed the complainant's automobile parked.[2] Officer Ohannasian testified that

[2] Identification of the automobile in question was made by observing its license plate. The plate number was traced to this vehicle.

the car was empty, and thus the officers drove out
of the parking lot to a point nearby where continued
surveillance could be made.    The officer testified
that he observed defendant and a young lady enter
the car.    At that moment the officers drove back
into the lot and parked behind the automobile in
question.   Defendant was placed under arrest.

At trial, the victim identified defendant as the
assailant who held the gun on him.

The defense was alibi.   Defendant claimed he was
at a high school basketball game at the time the
robbery was committed.   The defense produced sev-
eral witnesses to substantiate this argument.   One
of those who testified on defendant's behalf was
Samuel King.   On direct examination Mr. King
stated that he met the defendant at a basketball
game and that they were together for the remainder
of the evening.   Later in the course of the trial,
the prosecution recalled the investigating officer,
Detective Taylor, who read, over defendant's objec-
tion, a statement he allegedly took from witness
King at the time Taylor interviewed him:[3]

"*The witness [Detective Taylor]*:   This is the
statement of Samuel King taken by Detective
Charles Taylor at 2249 South Electric, Detroit, Mich-
igan.   Time: 1:30 a.m. Saturday, June 14, 1969:
'I went to the game that night.   I saw Larry there
but it wasn't until after the game.   Anyway, the
game was over I don't know what time it was but
Larry did not go to the Castle with me.   We were
parked in the Castle parking lot.   Larry might have
come over sometime during the time he was at the
Castle and got in my car and got right back out but
he didn't go to the Castle with me.   They told me

---

[3] The trial commenced on a Thursday and ended the following
Wednesday.   Witness King testified on Monday.   On the intervening
Saturday, he was interviewed by Detective Taylor.

to say that he was with me but I told them I wasn't going to lie for them and I didn't want to get involved.'

"This is what he told me."

The court overruled the objection following the prosecutor's explanation that the evidence was being introduced solely for impeachment purposes. The statement was not read to prove the truth or falsity of witness King's prior testimony. Instead, it was read to contradict the prior testimony. The statement is not hearsay information as that term is evidentially understood.

"Testimony, the truth of which is not to disprove the crime but which if believed would tend to discredit the witnesses, cannot be classed as hearsay." *Smith* v. *United States* (CA6, 1960), 283 F2d 16, 20, *cert den* 365 US 847 (81 S Ct 808, 5 L Ed 2d 811).

In accord: *United States* v. *88 Cases, More or Less, Containing Bireley's Orange Beverage* (CA3, 1951), 187 F2d 967, 974; *Carantzas* v. *Iowa Mutual Insurance Co.* (CA5, 1956), 235 F2d 193, 196; *Young* v. *State Farm Mutual Automobile Insurance Co.* (CA4, 1957), 244 F2d 333, 337.

Nor is the use of witness Taylor's memorandum statement an example of present memory improperly refreshed. For unlike present memory refreshed, the document referred to by the testifying witness was not set aside. *People* v. *Thomas* (1960), 359 Mich 251; *People* v. *Redman* (1969), 17 Mich App 610. Instead, this document was read into the record.

The memorandum now in question allegedly is Detective Taylor's verbatim transcription of his interview with witness King. Its contents, if actually stated by witness King and accurately re-

corded by Detective Taylor, constitute a prior in-
consistent out-of-court statement. To introduce
such a prior inconsistent statement, the laying of a
proper foundation is required. *Osborne* v. *United
States* (CA9, 1967), 371 F2d 913, *cert den* 387 US
946 (87 S Ct 2082, 18 L Ed 2d 1335); *People* v.
*Keller* (1933), 261 Mich 367. The foundation was
laid when Mr. King, on cross-examination, was chal-
lenged with the information he allegedly gave De-
tective Taylor:

"*Q.* Do you know this man right here sitting in
front of me?

"*A.* I don't know him.

"*Q.* You don't know him?

"*A.* No.

"*Q.* Do you know who he is?

"*A.* I know he is a detective.

"*Q.* Do you know what his name is?

"*A.* Taylor.

"*Q.* Taylor?

"*A.* Yeah.

"*Q.* All right. Is today the first day you ever saw
him?

"*A.* No.

"*Q.* Did he come to see you over the weekend?

"*A.* Yes.

"*Q.* Did you talk to him over the weekend?

"*A.* Yes.

"*Q.* Did you tell him anything different than you
told us here today?

"*A.* No.

"*Q.* Did you tell Detective Taylor, when he came
to see you this weekend, that this man had never
been in your car on that evening and wasn't riding
with you that evening?

"*A.* No, I didn't.

"*Q.* And you hadn't been with him a whole year
at that time?

"*A.* No.

"*Q.* Did you tell the detective that?

"*A.* No.

"*Q.* You didn't?

"*A.* No.

"*Q.* You are sure about that, huh?

"*A.* Yes."

Witness King denied ever telling Detective Taylor anything which was inconsistent with his trial testimony. When the prosecution recalled Detective Taylor to refute this, he testified:

"*Q.* Did you take a written statement from Mr. King?

"*A.* I wrote it down and Mr. King was talking.

"*Q.* As Mr. King was talking to you, you wrote it down?

"*A.* Yes, exactly word for word what he said.

"*Q.* All right, I'm going to show you a piece of paper and ask you if you can identify that.

"*A.* Yes.

"*Q.* All right, can you tell me what it represents to you?

"*A.* That is a statement Mr. King given [*sic*] to me by him."

Detective Taylor also testified that Mr. King declined to sign this statement because he "did not want to get involved".

Detective Taylor's memorandum was introduced solely to impeach Mr. King's prior in-court testimony. It is generally held that a witness may be impeached by showing that his testimony upon a material matter is inconsistent with a prior statement made by him. 3A Wigmore on Evidence, §§ 1017–1022, pp 993–1018; McCormick on Evidence §36, pp 66–67. A witness may be impeached by producing written statements which are inconsistent with the testimony given at the trial. 1 Under-

hill's Criminal Evidence (5th ed), § 230, p 531. Michigan courts have traditionally allowed written statements made at the direction of the witness to be later used to impeach the witness's prior testimony. *People* v. *Kennedy* (1895), 105 Mich 434; *People* v. *Tice* (1897), 115 Mich 219; *People* v. *Dellabonda* (1933), 265 Mich 486; *People* v. *De-Beaulieu* (1944), 308 Mich 173. Witness King allegedly told witness Taylor what he knew. The memorandum, written in the hand of witness Taylor, represents the summary of that interview. Whether it is a verbatim transcription or the conclusions of witness Taylor is for the finder of fact to determine. However, in either instance it represents an alleged contradictory position to witness King's in-court testimony, and for the purposes of impeachment, was admissible. *People* v. *Nemeth* (1932), 258 Mich 682.

Furthermore, the trial court correctly instructed the jury that they could only consider this evidence for impeachment purposes. *People* v. *Durkee* (1963), 369 Mich 618. The court advised the jury that they could not consider the statement of King as recited by witness Taylor for the purpose of its truth nor could it be considered as substantive evidence. He further advised the jury that they could consider this testimony *only* for the purpose of testing the credibility of the witness.

We find no error in this regard. Other questions raised on appeal have been considered, and we find no reversible error.

Affirmed.

R. B. Burns, J., concurred.

Levin, J. (*dissenting*). I am in full agreement with my colleagues that the people were entitled to

impeach the credibility of a witness who testified
in support of the defendant's alibi by showing that
the witness told a different story to a detective than
the one he related at the trial.   Plainly, incontro-
vertibly, that is the law.

The real issue—not touched on in the majority
opinion—concerns the manner in which the people
were allowed to prove the prior inconsistent state-
ment.

Over the objection of the defendant's lawyer, the
trial judge allowed the detective to read a written
statement he wrote out at the time of his conversa-
tion with the alibi witness; the witness had refused
to sign the statement.   The judge ruled that the
detective could read the statement under the excep-
tion to the hearsay rule for past recollection re-
corded.   In that ruling the judge erred on the facts
of this case.

## I.

The defendant was convicted of committing the
offense of armed robbery.   The defense was alibi.[1]
The defendant claimed that he was at a high school
basketball game at the time of the robbery.   Sixteen
of his friends, among them, Samuel King, supported
various time sequences of his alibi.

---

[1] The facts are set forth at some length in the majority opinion.
In summary, the people's evidence was as follows: The victim testified
that while he was driving his automobile it was bumped from behind
by another automobile.   After he had alighted to inspect the dam-
age, one of the five or six occupants of the other automobile con-
fronted him with a gun.   The man with the gun and his companions
struck the victim and took his wallet.   The victim broke away and
ran toward a nearby house and was shot in the back.   He obtained
aid and survived.

Four hours after the robbery the victim's automobile was sighted
by police officers at a drive-in restaurant.   They staked it out and
a short time thereafter the defendant and a young lady entered
the automobile.   The defendant was arrested.   At the trial, the
victim identified the defendant as the occupant of the automobile
who held the gun on him.   See footnote 10 and accompanying text.

The trial commenced on a Thursday and ended the following Wednesday. On the intervening Saturday King was interviewed by a detective. King testified on Monday.

On direct examination, King said that he met the defendant at the game at halftime, was with him during the second half and left the game with him and other persons in King's automobile. The group made two stops and then proceeded to the drive-in restaurant where the defendant, a short time afterwards, was arrested.

During cross-examination, King denied having given the detective a different account. Specifically, King denied telling the detective that the defendant was not in King's automobile during the evening the crime was committed.

The people called the detective as a rebuttal witness. He testified that when he interviewed King on the intervening Saturday he wrote down what King said but King refused to sign the writing. The defendant's lawyer objected to the introduction or reading of the writing on the ground that it was hearsay.[2] The judge overruled the objection saying

[2] *Hileman* v. *Indreica* (1971), 385 Mich 1, 10, shows that our Supreme Court does not require absolute precision in voicing objections in order to preserve for review the propriety of a trial judge's ruling concerning the admissibility of evidence where the judge fails to see all the aspects of a multi-faceted problem of admissibility.

The defendants in that case contended successfully in our Court (see *Hileman* v. *Indreica* [1969], 15 Mich App 662, 664, 665) "that plaintiff did *not state* to the trial judge that she sought to use the deposition [of a witness] to *refresh the recollection* of the witness and to induce her to correct her testimony, but rather sought to have the trial judge declare the witness hostile in order to impeach her testimony" (emphasis supplied). The judge had ruled that the deposition could not be used because the witness was not hostile and plaintiff could not impeach her own witness.

On appeal the Supreme Court reversed and held that the deposition could be used to refresh the witnesses' recollection saying that the judge had erroneously "looked upon the *effort of counsel* [emphasis added] solely as an attempt to *impeach* [the witness], or

that the detective's testimony was admissible as past recollection recorded. The detective then read the statement as follows:

"This is the statement of Samuel King taken by Detective Charles Taylor at 2249 South Electric, Detroit, Michigan. Time: 1:30 a.m. Saturday, June 14, 1969: 'I went to the game that night. I saw Larry there but it wasn't until after the game. Anyway, the game was over I don't know what time it was but Larry did not go to the Castle with me. We were parked in the Castle parking lot. Larry might have come over sometime during the time he was at the Castle and got in my car and got right back out but he didn't go to the Castle with me. They told me to say that he was with me but I told them I wasn't going to lie for them and I didn't want to get involved.'
"This is what he told me."

## II.

The majority ignore the judge's ruling that the statement was admissible under the exception for past recollection recorded and affirm his ruling admitting the statement on the ground that "the statement is not hearsay information as that term is evidentially understood."

We will, of course, ordinarily sustain on appeal a ruling by a judge who reaches the right result even though the grounds for decision stated by him are erroneous.[3] In this case the judge reached the wrong

---

as an effort to have her judged 'hostile' ". (Last emphasis added by the Court.)

Implicit in the judge's ruling that the statement was admissible under an exception to the hearsay rule is recognition on the judge's part that the writing itself was hearsay. See footnote 4 *infra* and accompanying text.

[3] 2 Michigan Law & Practice, Appeal, § 282.

result—the unsigned written memorandum was not shown to be admissible.

It is also true that a prior inconsistent statement of a witness, admissible to impeach his credibility, is not regarded as admissible as an exception to the hearsay rule. It is admissible on the tenet that it is not hearsay because it is not offered as substantive evidence to prove the truth of the statement attributed to the witness but to prove that he said it. In theory at least the trier of fact is not being asked to accept the substance of the prior statement as the true account of the matter but rather to discount the witness's at-trial testimony because on an earlier occasion he gave a different account.

However, merely because the statement made by King to the detective *when* offered to impeach King's credibility is not hearsay, does not grant free license to introduce it by any means. Whether the earlier statement is, as here, oral or is written, the fact that it was made must be proved. If the earlier statement is written, the witness's handwriting or signature must be proved. If the earlier statement is oral the impeaching witness must be able to testify that the inconsistent statement was in fact made.

Just as an impeaching witness could not testify, in the name of impeachment, that Frank told him that Joe told Frank that Sara remarked to Bill that the chief defense witness had told her that the defendant had threatened the victim, so, too, an out-of-court written memorandum of an oral statement allegedly made by the witness to be impeached may be used *to prove the fact that the statement was made* only if that fact—the fact that the witness made the statement—is provable by means of such a memorandum.

Although the inconsistent statement, when admissible to impeach credibility, is not hearsay, the written memorandum of the statement, unsigned by the witness being impeached, is hearsay and therefore admissible, if at all, only under an exception to the hearsay rule.[4]

A written memorandum of an oral statement made by another person, not signed by that person, necessarily reflects two statements; one written, the other oral: (1) it is the *written statement* of the writer of the memorandum that (2) the other person made the *oral statement* attributed to him.

Since the written memorandum, not signed by the other person, is an out-of-court statement made by the writer that the other person said what is contained in the writing, the writing itself is hearsay without regard to whether the statement recorded in it is offered as substantive evidence or solely to impeach credibility. The rules of evidence concerning the proof of facts do not evaporate upon utterance of the magic word "impeachment".[5]

---

[4] See 3 Wigmore on Evidence, § 754a; McCormick on Evidence, §§ 276, 278.

[5] I have found no authority holding that the fact that an inconsistent statement was made may be proved by the use of a memorandum of the statement not signed by the witness to be impeached without a showing that the person who made the memorandum cannot testify from present memory refreshed. See discussion in Part III of this opinion *infra.*

The question can arise whenever a stenographic transcript is offered to prove a prior inconsistent statement. Understandably in that kind of case, where it is obvious that the stenographer could not possibly recall the testimony or truly refresh his recollection by reading it and must testify based on past recollection recorded, no point is sometimes made about a failure to prove inability to testify from refreshed recollection. See *St. Louis, S. F. & T. R. Co.* v. *Williams* (Tex Civ App, 1937), 104 SW2d 103, 105; *People* v. *Sherman* (1950), 97 Cal App 2d 245 (217 P2d 715, 721).

Nevertheless in other cases the governing principle has been recognized, the courts stating that the stenographer could read a transcript of shorthand notes because he could not testify from refreshed or revised present recollection. See *State* v. *Polan* (1956), 80 Ariz 129 (293 F2d 931, 933); *Hudlow* v. *Langerhans* (1936), 230

### III.

A witness who does not have a present recollection of the facts may refer to a written memoran-

---

Mo App 1160 (91 SW2d 629); *Klepsch* v. *Donald* (1894), 8 Wash 162 (35 P 621, 623). Similarly see *Stahl* v. *City of Duluth* (1898), 71 Minn 341 (74 NW 143, 146); *Cooper* v. *Hoeglund* (1946), 221 Minn 446 (22 NW2d 450, 455).

*Cf. Robertson* v. *M/S Sanyo Maru* (CA5, 1967), 374 F2d 463, holding that a purported copy of a statement signed by a witness and offered for impeachment purposes was improperly admitted since it had not been authenticated and the best evidence rule had not been complied with. See, also, *Boulch* v. *John B. Gutmann Construction Company, Inc.* (Mo App, 1963), 366 SW2d 21, 36.

In this case, the statement was not taken down by a stenographer. It does not purport to be a verbatim report of the questions and answers. It is a brief memorandum of a conversation. There is an obvious difference between a stenographic transcript prepared by a court reporter and a memorandum prepared by an investigator for one of the litigants.

The cases cited by the majority are distinguishable:

*People* v. *Kennedy* (1895), 105 Mich 434, 436, dealt not with out-of-court statements but with depositions made by a witness at a preliminary examination. The court held that the statements were "admissible as original evidence". It was sought to introduce the depositions through the testimony of the deputy clerk who recorded them at the preliminary examination. The court approved use of the written record only to refresh the memory of the witness.

In *People* v. *Tice* (1897), 115 Mich 219, no writing was involved and the testimony was solely from memory. No question of past recollection recorded was, therefore, presented.

In *People* v. *Dellabonda* (1933), 265 Mich 486, the earlier written statement sought to be introduced for impeachment purposes had been written by the witness being impeached. Again, no question of past recollection recorded was presented.

In *People* v. *Nemeth* (1932), 258 Mich 682, the prosecutor read to the jury statements made to the police by defense witnesses. The opinion does not indicate that the witnesses denied having made the statements or that the statements were not signed by the witnesses. Furthermore, there is no discussion of what foundation, if any, was laid for their admission.

Finally, *People* v. *DeBeaulieu* (1944), 308 Mich 173, 177, rather than supporting the position taken by the majority, held that a writing, signed by the witness sought to be impeached but prepared by another, was properly excluded where it appeared that the witness was unaware of what she had signed. The Court cited 6 Jones, Commentaries on Evidence (2d ed), § 2406, p 4746, for the proposition that "in order to serve as in itself a contradiction a writing must be shown to have been made by the witness himself, or by someone under his direction, or to have been approved and adopted by the witness as his own act and deed."

dum.  If the memorandum refreshes his recollection, "when he speaks from a memory thus revived, his testimony is what he says, not the writing".[6]  Accordingly, the general rule is that a party who uses a memorandum to refresh the memory of a witness may not introduce it in evidence or have it read to the jury.[7]

In this case the witness did not claim that his recollection was refreshed by reading the writing— he read the writing itself.  This was not a case of testimony from refreshed recollection.

Nor, contrary to the ruling of the judge, did the prosecution make out a case for introduction of the writing as past recollection recorded.  The exception for past recollection recorded may be availed of only in a case where it is claimed that the witness has no present recollection of the facts and, upon reference to the document, his memory is *not* refreshed.[8]  When a witness testifies based on past recollection recorded it is the writing, not refreshed recollection, that is the evidence.

It is most difficult to cross-examine a witness who is allowed to "testify" based on past recollection

---

[6] McCormick, Law of Evidence, § 9, p 15; 58 Am Jur, Witnesses, § 579.

[7] 29 Am Jur 2d, Evidence, § 876.

[8] See *People* v. *Hobson* (1963), 369 Mich 189, 190–192; *People* v. *Blakes* (1966), 4 Mich App 13, 16; *People* v. *Bracy* (1967), 8 Mich App 266, 276; *Jaxon* v. *City of Detroit* (1967), 379 Mich 405, 413 (per T. E. BRENNAN, J.); 58 Am Jur, Witnesses, § 588.

Additional pre-conditions to admissibility are a showing that the document was prepared at some prior and rather remote date (*People* v. *Hobson, supra*), that the document is an original memorandum made by the witness from personal observation contemporaneously with or near the time of the transaction recorded (*People* v. *Hobson, supra; Jaxon* v. *City of Detroit, supra*) and that the substance recorded is not otherwise admissible (*Jaxon* v. *City of Detroit, supra*).

And, since in a case of past recollection recorded, in contrast with refreshed recollection, the writing, not revived recollection, is the evidence, most courts hold that the writing may be introduced in evidence in connection with the witness' testimony during his direct examination.  See 29 Am Jur 2d, Evidence, § 877, p 978.

recorded. In allowing him to read the writing, the
judge finds that he now has no present recollection
of what was said when the writing was made and
that his memory cannot be revived by reference to
the writing; when cross-examined, such a witness is
bound to retreat behind the writing.

The written word has a way of carrying greater
weight than the spoken word. The law, therefore,
wisely limits the use of past recollection recorded
to those situations where the just mentioned pre-
conditions to admissibility have been satisfied. Dis-
pensing with the requirement that the witness not
have "sufficient recollection to enable him to testify
fully and accurately" would, as stated in the com-
mentary accompanying the Revised Draft of Pro-
posed Rules of Evidence for the United States Dis-
trict Courts and Magistrates, "encourage the use
of statements *carefully prepared for purposes of
litigation* under the supervision of attorneys, inves-
tigators or claim adjusters". (Emphasis supplied.)[9]

---

[9] Text writers argue that the evidence should be admissible without
regard to whether the witness remembers the event recorded (3 Wig-
more on Evidence [Chadbourn Rev, 1970], § 738, p 91), but their views
have not been accepted by most courts.

Indeed, the very argument advanced by these writers points up
the danger of allowing use of past recollection memoranda indiscrim-
inately. Just as they are of the opinion that the memoranda is
likely to be more accurate than the witness' recollection, so, too, the
trier of fact is likely to be under that impression. It is to guard
against the indiscriminate creation, without any necessity, of "better"
evidence that most courts have restricted the use of past recollection
recorded writings.

The following appears in the commentary accompanying the Re-
vised Draft of Proposed Rules of Evidence for the United States
District Courts and Magistrates (March, 1971), Rule 803, p 111,
exception 5 (51 FRD 315, 425):

"The principal controversy attending the exception has centered,
not upon the propriety of the exception itself, but upon the question
whether a preliminary requirement of impaired memory on the part
of the witness should be imposed. The authorities are divided. If
regard be had only to the accuracy of the evidence, admittedly im-
pairment of the memory of the witness adds nothing to it and should
not be required. McCormick § 277, p 593; 3 Wigmore § 738, p 76;

The detective was not asked whether he had any present recollection of what King told him on Saturday—three days before he testified—or whether his recollection would be refreshed by reference to the writing. It is doubtful whether, if the detective had been so questioned, he would have claimed both that he had no recollection and that his recollection could not be refreshed from a writing he made just three days before he testified.

## IV.

The admission of this inadmissible testimony could not properly be said to be harmless. There was a close question for resolution by the trier of fact. Although the defendant was seen, just a few hours after the robbery, entering the stolen automobile at the drive-in restaurant by police officers who had staked out the automobile, that did not establish that the defendant was one of the assailants. There were a number of assailants and what was done with the automobile between the time of the robbery and the time the defendant was apprehended was

_Jordan v. People_ (1962), 151 Colo 133 (376 P2d 699), _cert den_ 373 US 944 [83 S Ct 1553, 10 L Ed 2d 699]; _Hall v. State_ (1960), 223 Md 158 (162 A2d 751); _State v. Bindhammer_ (1965), 44 NJ 372 (209 A2d 124). Nevertheless, the absence of the requirement, it is believed, would encourage the use of statements carefully prepared for purposes of litigation under the supervision of attorneys, investigators, or claim adjusters. Hence the example includes a requirement that the witness not have 'sufficient recollection to enable him to testify fully and accurately.' To the same effect are California Evidence Code § 1237 and New Jersey Rule 63(1)(b), and this has been the position of the federal courts. _Vicksburg & Meridian R.R._ v. _O'Brien_ (1886), 119 US 99 [7 S Ct 118, 30 L Ed 299]; _Ahern_ v. _Webb_ (CA10, 1959), 268 F2d 45; and see _N.L.R.B._ v. _Hudson Pulp & Paper Corp._ (CA5, 1960), 273 F2d 660, 665; _N.L.R.B._ v. _Federal Dairy Co._ (CA1, 1962), 297 F2d 487. But _cf. United States_ v. _Adams_ (CA2, 1967), 385 F2d 548."

In all events, the Michigan Supreme Court appears to have aligned itself with the view that the writing is not admissible if the witness can independently recall the event or can refresh his recollection from the writing. See cases cited in fn 8.

not shown. The defendant's act of entering the automobile was at best circumstantial evidence, implicating him but not pointing assuredly to his guilt.

This left the identification testimony of the victim. His identification was not certain; he conceded that it was possible—although not probable—that he was mistaken. In this connection it is noteworthy that, although the defendant was in custody, the police showed a photograph to the victim the day he was released from the hospital.[10] The victim had not theretofore given the police a description of any of his assailants. He was not asked to view the defendant in a lineup. He did not view the defendant after he was arrested until the defendant was brought into the courtroom for the preliminary examination.

The resolution of the factual issue depended on the jury's evaluation of the victim's identification testimony and the contradictory testimony of the alibi witnesses. The detective's rebuttal testimony discrediting alibi witness King tended to discretit not only King's testimony but also the testimony of the other alibi witnesses who said they saw the defendant when he was with King.

The detective's rebuttal testimony was especially damaging to the defendant because of the statement attributed to King that "*they* told me to say that he was with me but I told them I wasn't going to lie for them and I didn't want to get involved". (Emphasis supplied.) It is doubtful whether the quoted words were admissible on any basis. They purport to be a statement by King as to what other

---

[10] See *People* v. *Rowell* (1968), 14 Mich App 190, 198 (Levin, J., concurring); *People* v. *Adams* (1969), 19 Mich App 131, 133, n 1; *United States* v. *Zeiler* (CA3, 1970), 427 F2d 1305, 1307; *Commonwealth* v. *Whiting* (1970), 439 Pa 205 (266 A2d 738).

unidentified people—"them"—told him; triple hearsay: (1) the writing was hearsay, (2) the statement by King to the detective was hearsay (although *when* offered to impeach credibility it is not), and (3) the statement attributed to "them" was hearsay. It is well nigh impossible for a party to respond to a hearsay statement attributed to "them". "Them" are not identified; King denied making the statement—he, therefore, could not or would not identify "them". Who among "them" could the defendant call to answer the charge that "them" asked King to lie?

We could not properly declare that the detective's inadmissible testimony did not contribute to or affect the result.