*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 19, 2025
9:09 AM

Plaintiff-Appellee,

v

No. 362277
Macomb Circuit Court
LC No. 2017-001875-FC

TERRELLE DISEAN TILLES,

Defendant-Appellant.

Before: RIORDAN, P.J., and BOONSTRA and YATES, JJ.

PER CURIAM.

According to the victim's testimony at trial, in 2010 or 2011, when he was between the ages of 4 and 6, defendant, Terrelle Disean Tilles, sexually assaulted the victim by penetrating the his anus with his penis. Years later, the victim disclosed the sexual assault to his adoptive mother, and that led to the criminal investigation and the conviction of defendant on a single charge of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a) (victim under 13 years of age, defendant 17 years of age or older). After defendant was sentenced to serve 25 to 49 years in prison, he appealed of right, challenging his conviction based upon several unpreserved issues and claims of ineffective assistance of counsel. Defendant also contests the constitutionality of one of the components of his sentence. We conclude that defendant received constitutionally ineffective assistance of counsel at trial that requires us to vacate his conviction. Accordingly, we remand the case for a new trial without addressing defendant's challenges to his sentence.

## I. FACTUAL BACKGROUND

The victim was born in 2005, and he spent the first few years of his life with his biological mother. Before the victim entered the foster-care system at the age of 6, his biological mother was dating defendant, who visited the family home on a regular basis. The victim's memories of the time he spent with defendant included an incident when defendant forced the victim to eat chicken with hot sauce, which the victim did not like because it burned his mouth. On another occasion, the victim was on a couch in the living room, defendant "came in and told [him] to get undressed," the victim disrobed, defendant "came under the blanket" with the victim, and then defendant "stuck his penis in [the victim's] anus." While that was happening, "a man walked in, in the room," and

-1-

"so then [defendant] stopped and then he zipped his pants back up and then went out of the room, somewhere else."

In 2013, while the victim was in the foster-care system, he moved in with the woman who eventually became his adoptive mother. After the victim moved into her home, he had a difficult bowel movement that resulted in bleeding. That reminded the victim of the incident that happened with defendant, which prompted the victim to disclose to his adoptive mother what defendant had done to him several years before that. That disclosure led to a criminal investigation, during which the victim provided a recorded statement explaining what defendant had done to him. The victim also wrote a statement explaining what had happened to him. The victim identified the perpetrator as "Kitty," which was defendant's nickname. When he testified about the incident at defendant's trial, the victim was 13 years old.

During the investigation, Detective Anthony Stone interviewed defendant, who denied that he committed the sexual assault, but stated "something to the effect that he can't say he didn't do it."[1] Toward the end of the interview, defendant told Detective Stone about a time when defendant was babysitting the victim and the victim defecated on himself. Defendant said that while he was cleaning the victim's buttocks, his fingertip may have penetrated the victim's anus.

In 2017, defendant was charged with CSC-I in an information alleging that defendant "did engage in sexual penetration, to-wit: PENILE/ANAL, OR DIGITAL/ANAL, with [the victim], a person under 13 years of age[.]" The filing of that information followed a preliminary examination where the prosecutor presented the victim's testimony of penile penetration and the district court bound over defendant on the basis of the penile penetration; no evidence of digital penetration was presented. But at trial, the prosecutor took the position that she was seeking a conviction based on either penile penetration supported by the victim's testimony during the trial or digital penetration supported by Detective Stone's testimony at trial about defendant's admission. The jury convicted defendant of the lone count of CSC-I on August 31, 2018, at the end of a four-day trial.

Following his conviction and sentence, defendant appealed. While his appeal was pending, defendant moved in the trial court for a new trial, alleging the same errors that he now raises in his appeal. The trial court conducted a *Ginther*[2] hearing on May 5, 2023, and then denied defendant's motion for a new trial in a 17-page opinion issued on December 4, 2023. Defendant responded by moving for reconsideration, but the trial court denied that motion in a six-page opinion issued on February 5, 2024. Consequently, we now can consider defendant's arguments on appeal with the benefit of a comprehensive record.

## II. LEGAL ANALYSIS

On appeal, defendant challenges his conviction and his sentence. Defendant contends that his right to a properly instructed jury was violated because the jury was not given an instruction

---

[1] The only evidence at trial of defendant's statements to Detective Stone came from the detective's testimony.

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

on specific unanimity. He also insists that the trial court erred when it denied his motion for a new trial based on the argument that the prosecution failed to establish the corpus delicti of the digital penetration. Next, defendant asserts that the prosecutor committed misconduct by appealing to the jury's sympathy or its sense of civic duty. Alternatively, defendant claims he received ineffective assistance of counsel because of defense counsel's mishandling of those three issues. Defendant further argues that defense counsel's performance was constitutionally deficient because she failed to present expert testimony on the issue of child memory, she failed to call two lay witnesses who would have testified in support of the defense theory, she failed to impeach the victim with prior inconsistent statements, and she failed to object to the admission of the victim's prior consistent statements, which defendant contends were inadmissible hearsay. Additionally, defendant argues that, at the very least, the cumulative impact of those errors deprived him of a fair trial. We shall take up each of the challenges to defendant's conviction in turn.

Whether defendant was denied effective assistance of counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The trial court's factual findings are reviewed for clear error, but its constitutional determinations are reviewed de novo. *Id*. "Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made." *People v Anderson*, 284 Mich App 11, 13; 772 NW2d 792 (2009) (quotation marks and citation omitted). The Constitutions of Michigan and the United States guarantee to a criminal defendant "the assistance of counsel for his or her defense." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012), citing US Const, Am VI; Const 1963, art 1, § 20. "[T]o obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Trakhtenberg*, 493 Mich at 51. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018) (quotation marks and citation omitted). "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Trakhtenberg*, 493 Mich at 52. "If this Court can conceive of a legitimate strategic reason for trial counsel's act or omission, this Court cannot conclude that the act or omission fell below an objective standard of reasonableness." *People v Haynes*, 338 Mich App 392, 429-430; 980 NW2d 66 (2021). This Court cannot insulate the review of counsel's performance by calling it trial strategy. *Trakhtenberg*, 493 Mich at 52. This Court must determine "whether the strategic choices were made after less than complete investigation, and any choice is reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## A. SPECIFIC UNANIMITY

Defendant argues that his right to a properly instructed jury was violated when the jury was not given a specific unanimity instruction. But defendant waived this issue, and thus extinguished any error and precluded appellate review. See *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011). Before the trial court read the final instructions to the jury, defense counsel stated that the instructions "appear to be appropriate." By voicing satisfaction with the proposed instructions, defendant waived all issues concerning those instructions on appeal. *Id*.

Alternatively, defendant contends that defense counsel was ineffective for failing to request a specific unanimity instruction, so we must consider defense counsel's role in the instructions that the trial court gave to the jury. A criminal defendant is entitled to a unanimous jury verdict. *People v Chelmicki*, 305 Mich App 58, 67; 850 NW2d 612 (2014), citing MCR 6.410(B). The trial court, therefore, is obligated to provide a proper unanimity instruction to the jury. *Id*. at 67-68. "Often, the trial court fulfills that duty by providing the jury with a general instruction on unanimity." *Id*. at 68. That instruction informs the jury that their verdict must be unanimous and that it is necessary that each of the jurors agrees on that verdict. M Crim JI 3.11(3). But "when the state offers evidence of multiple acts by a defendant, each of which would satisfy the *actus reus* element of a single charged offense, the trial court is required to instruct the jury that it must unanimously agree on the same specific act if the acts are materially distinct or if there is reason to believe the jurors may be confused or disagree about the factual basis of the defendant's guilt." *People v Cooks*, 446 Mich 503, 530; 521 NW2d 275 (1994). The "*actus reus*" is "[t]he wrongful deed that comprises the physical components of a crime . . . ." *Black's Law Dictionary* (10th ed). Alternative acts are materially distinct "where the acts themselves are conceptually distinct or where either party has offered materially distinct proofs regarding one of the alternatives." *Cooks*, 446 Mich at 524. "The critical inquiry is whether either party has presented evidence that materially distinguishes any of the alleged multiple acts from the others." *Id*. at 512. Ordinarily, "the evidence will be materially distinct regarding one of the multiple acts allegedly committed by the defendant." *Id*. at 530 n 34.

"[A] specific unanimity instruction is not required in *all cases* in which more than one act is presented as evidence of the actus reus of a single criminal offense." *Id*. at 512. For instance, a a specific unanimity instruction is not required when the prosecution presents "evidence of a series of materially indistinguishable acts, each of which would factually satisfy the *actus reus* element of the alleged criminal offense . . . ." *Id*. at 517. Accordingly, a general unanimity instruction is sufficient when "materially identical evidence is presented with respect to each act, and there is no juror confusion[.]" *Id*. at 512-513.

Here, defendant was charged under MCL 750.520b(1)(a), which required the prosecution to establish that defendant "engaged in sexual penetration with another person and . . . [t]hat other person is under 13 years of age." To satisfy the *actus reus* of that charge—the sexual penetration—the prosecution presented evidence of two types of penetration: (1) penetration of the victim's anus by defendant's penis; and (2) penetration of the victim's anus by defendant's finger. At trial, the prosecutor clearly stated that the jurors could convict defendant on the basis of either penetration. In opening statement, the prosecutor explained to the jury why she had filed one count of CSC-I and two alternative acts upon which the jury could convict defendant of that single charge. The prosecutor advised the jury that the victim would testify that defendant "stuck his . . . penis in his anus," but that there was also evidence of "defendant admitting that he stuck his finger in his anus, which is also penetration." Thus, the prosecutor had "charged it in a way in the alternative that we know that there's a penetration that occurred." She explained that the jury could convict defendant if the jury believed that the victim "was penetrated by his finger and/or his anus[.]"[3]

---

[3] Presumably, the prosecutor meant to say "penis," not "anus."

-4-

During trial, the prosecutor presented evidence in the form of testimony from the victim to support the claim that defendant committed penile penetration. The victim described an instance when defendant came into the room, told the victim to remove his clothes, then unzipped his own pants and put his penis in the victim's anus. To support the claim that defendant penetrated the victim's anus with his finger, the prosecutor presented the testimony of Detective Stone, who had interviewed defendant in 2016 regarding the victim's allegations. During that interview, defendant disclosed to Detective Stone that, at some unspecified time, the victim had had a bowel movement and defendant was cleaning the victim. During that process, the tip of defendant's finger may have penetrated the victim's anus.

In closing argument, the prosecutor emphasized to the jury that it could convict defendant on the basis of the penile penetration that the victim described *or* the digital penetration supported by the evidence of defendant's statement to Detective Stone. Specifically, the prosecutor indicated that she had to prove that "defendant engaged in a sexual act that involved entry into [the victim]'s anal opening by the defendant's penis or finger." Just as she did during her opening statement, the prosecutor explained to the jury that she had charged this case in this manner "because [the victim] may not remember everything, and the defendant is admitting that he penetrated his anus, and [the victim] is saying that he penetrated with his penis." Referring to penetration, the prosecutor then reiterated that "if its finger, or penis, or both, you can convict." The trial court instructed the jury that it could convict defendant if it found, among other elements, "entry in to [the victim]'s anal opening by defendant's penis or finger." The trial court then read a general unanimity instruction to the jury, which told the jury that its verdict "must be unanimous," and that "[i]n order to return a verdict, it is necessary that each of you agrees on that verdict."

In the trial court's opinion rendered after the *Ginther* hearing, it ruled that defense counsel was not ineffective for failing to request a specific unanimity instruction because that instruction was unnecessary. The trial court explained that, although the acts of digital penetration and penile penetration "may appear materially different in their contexts, they both reflect the penetration of the complainant's anus by an adult male." The trial court further commented that "the jury could reasonably construe Defendant's confession as a downplayed version of events or admission to some kind of pattern of grooming or the first act of escalating behavior that eventually led to the incident described by Complainant." Later, in response to defendant's motion for reconsideration, the trial court stated that the prosecution had presented it "as the same act described differently."

We conclude that the trial court erred in determining that a specific unanimity instruction was unnecessary. The jury had the option of convicting defendant of the single CSC-I count based on either the penile penetration or the digital penetration. The prosecutor repeatedly reminded the jury of that. Thus, the prosecution offered two separate acts, each of which would satisfy the *actus reus* of the single CSC-I charge. See *Cooks*, 446 Mich at 530. But those two acts were materially different, see *id.*, and defendant interposed two entirely separate defenses to the prosecutor's claim that each of those acts constituted a crime. The evidence regarding penile penetration came largely from the victim's testimony, which described lying on the living room couch while a man walked into the living room, told him to undress, and then penetrated the victim's anus with his penis. In contrast, Detective Stone told the jury about defendant's admission of digital penetration, which occurred as defendant was cleaning the victim after the victim defecated on himself. In his defense, defendant asserted that the penile penetration either did not occur or, if it did, the perpetrator was

someone other than defendant. Defendant did not dispute that the digital penetration occurred, but argued that it was not sexual in nature.[4]

The alternative acts—defendant telling the victim to undress, then getting under a blanket and penetrating the victim's anus with his penis or defendant inadvertently penetrating the victim's anus with his finger while changing a soiled diaper—are conceptually distinct, and the competing parties offered materially distinct proofs regarding the two alternatives. See *id*. at 512, 524. Unlike in *Cooks*, where our Supreme Court decided that a specific unanimity instruction was not required, the jury here was tasked with more than determining the credibility of the victim as to the pattern of alleged conduct. *Id*. at 528. The victim did not provide testimony about the digital penetration, and so the jury needed to weigh the testimony of Detective Stone when considering that issue. As a result, a specific unanimity instruction was warranted at defendant's trial, and we can conceive of no legitimate strategic reason not to request such an instruction. See *Haynes*, 338 Mich App at 429-430. Indeed, at the *Ginther* hearing, defense counsel said she did not remember if there was a reason for not requesting a specific unanimity instruction. No negative consequence would flow from such a request, and failing to request that instruction introduced the risk that the jury would convict defendant even if the jury could not agree on which penetration defendant committed. In that respect, defense counsel's performance fell below an objective standard of reasonableness.

Also, we conclude that defendant was prejudiced by counsel's deficient performance. See *Trakhtenberg*, 493 Mich at 51. In a recent, unpublished opinion addressing a claim of ineffective assistance based on defense counsel's failure to request a specific unanimity instruction, this Court ruled that there was a reasonable probability that the outcome of the trial was affected by counsel's deficient performance because it could not "say with any confidence that there was unanimity on defendant's conviction *relative to the specific underlying acts supporting that conviction*." *People v Dunn*, unpublished per curiam opinion of the Court of Appeals, issued October 6, 2022 (Docket No. 356026), p 5. This Court held that defendant was prejudiced despite an acknowledgment that "the evidence may have been sufficient for a jury to conclude that defendant committed all of the alleged acts . . . ." *Id*. Because of the lack of a specific unanimity instruction, this Court concluded that "it appears reasonably probable that the jurors could have assessed the weight and credibility of the evidence differently and reached their verdicts on different factual bases." *Id*.

Here, because the trial court decided that a specific unanimity instruction was unnecessary, it did not analyze whether defendant was prejudiced by the failure to request such an instruction. In response to defendant's motion for reconsideration, the trial court revisited the issue. Despite

---

[4] The viability of that defense is debatable. Our Supreme Court has ruled that "sexual penetration" as required for the offense of CSC-I under MCL 750.520b(1) "can be for any purpose[,]" *People v Lemons*, 454 Mich 234, 253; 562 NW2d 447 (1997), whereas "CSC-II requires the prosecutor to prove 'sexual contact' " that involves "touching that 'can reasonably be construed as being for the purpose of sexual arousal or gratification.' " *Id*. Under that analysis, any sexual penetration—whether accomplished for a sexual purpose or not—can support a conviction for CSC-I. See, e.g., *People v Levran*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 370931); slip op at 3-4.

again concluding that defense counsel's performance did not fall below an objective standard of reasonableness when she failed to request a specific unanimity instruction, the trial court discussed prejudice to defendant. But the trial court's prejudice analysis was based on the inaccurate premise that "the prosecution presented it as the same act described differently." The trial court commented that "[h]ad even one member of the jury believed Defendant's narrative of two separate acts, one of which was innocent, as opposed to the prosecution's narrative of the same act described two different, (sic) one of which was self-serving, then the jury would have hung at the very least. The fact that the jury convicted indicates that they did not believe Defendant." That conclusion defies logic. If "the jury believed Defendant's narrative of two separate acts, one of which was innocent," but the other not innocent, the jury still could have convicted defendant, because it was repeatedly told by both the prosecutor and the trial court that it could convict defendant if it found that digital *or* penile penetration had occurred. When there was no evidence to suggest that the two incidents occurred at the same time, or even in the same year, the suggestion that the two drastically different accounts described the same event is unsustainable.

Because of the manner in which the case was charged and how the jury was instructed, we cannot determine whether the jury convicted defendant on the basis of the penile penetration, the digital penetration, or both.[5] See *People v Yarger*, 193 Mich App 532, 537; 485 NW2d 119 (1992) (holding that defendant had established error requiring reversal on his unpreserved appellate claim regarding a failure to provide a specific unanimity instruction when it was "impossible to discern of which act of penetration defendant was found guilty"). And, as a result, we cannot determine whether the jury was unanimous on which penetration was established beyond a reasonable doubt. There exists the possibility that some jurors convicted defendant based on the penile penetration only, while other jurors convicted defendant based on the digital penetration only. Therefore, we conclude that a specific unanimity instruction was required, that defense counsel's performance in failing to request such an instruction fell below an objective standard of reasonableness, and that defendant was prejudiced by his trial attorney's deficient performance.

## B. CORPUS DELICTI

Next, defendant contends that the admission of his confession to Detective Stone that he had accidentally digitally penetrated the victim's anus violated the *corpus delicti* rule, and that the trial court erred by denying his motion for a directed verdict predicated on that alleged violation. Alternatively, defendant asserts that his defense counsel was ineffective for failing to object to the admission of testimony about defendant's statement to Detective Stone. According to the *corpus delicti* rule, "a defendant's confession may not be admitted unless there is direct or circumstantial

---

[5] It is unclear why the prosecutor decided to charge defendant in one count, rather than two separate charges. The error concerning specific unanimity would have been avoided had the prosecution either charged defendant with two counts, with each count corresponding to a specific penetration, or brought only one count and only alleged one penetration, as it did at the preliminary examination by presenting evidence only of penile penetration. Michigan law did not preclude the prosecution from charging defendant in the manner that it did, but the information filed by the prosecution set the trap that ensnared defense counsel at trial, and the benefit of charging defendant in the manner that the prosecution chose seems illusory.

evidence independent of the confession establishing (1) the occurrence of the specific injury (for example, death in cases of homicide) and (2) some criminal agency as the source of the injury." *People v Kinrad*, 449 Mich 263, 269-270; 536 NW2d 517 (1995). But the *corpus delicti* rule " 'is confined to confessions.' " *People v Washington*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket No. 165296); slip op at 18. A statement is merely an "admission" if it needs "other facts to give [it] convicting force[.]" *Id*. If a defendant's statement does not include every element of the charged crime, it is merely an "admission," and not a "confession," so it is not excluded by the *corpus delicti* rule. *Id*. at ___; slip op at 19.

Here, no independent evidence established that defendant digitally penetrated the victim's anus. But our Supreme Court recently held that a defendant's inculpatory statement implicates the *corpus delicti* rule only if the statement included all the essential elements of the crime. *Id*. at ___; slip op at 18-19. In *Washington*, our Supreme Court ruled that the defendant's statement that he possessed a bulletproof vest was not a confession, and so it did not involve the *corpus delicti* rule, because the statement did not contain all the essential elements of the crime. *Id*. Thus, based on *Washington*, we conclude that defendant's statement here was not a confession because it did not include all essential elements of the crime, i.e., it did not include that the victim was under 13 years old at the time. Because defendant has failed to demonstrate that the admission of testimony about his statement was improper, we conclude that the trial court did not err when it denied defendant's motion for a directed verdict or when it concluded that defendant's trial attorney did not perform deficiently in that regard.

## C. FAILURE TO PRESENT EXPERT TESTIMONY

Defendant next argues that his defense counsel was ineffective for failing to present expert testimony on child memory. He contends such expert testimony would have bolstered his defense that the victim's allegations were unreliable. "An attorney's decisions whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). "[F]ailure to call a witness can constitute ineffective assistance of counsel only when it 'deprives the defendant of a substantial defense.' " *Id.* (citation omitted). A defendant alleging ineffective assistance of counsel "must meet a heavy burden to overcome the presumption that counsel employed effective trial strategy." *Id*. A trial strategy is not ineffective just because it ultimately does not succeed. *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020).

Here, defense counsel tried to secure expert testimony to present at trial. Before the trial, defendant obtained funds to retain an expert to evaluate the victim's competency. At defendant's request, the trial court agreed to appoint Dr. Steven Miller to "complete a full Forensic Evaluation to determine the overall competency of the complaining witness." In that order, which was entered on February 1, 2018, nearly seven months before the trial, the trial court pointed out that the parties had acknowledged that Dr. Miller "will NOT have any face-to-face access" to the victim. Thus, Dr. Miller's role from the start was limited as to the competency of the specific victim in this case, and the limitations of Dr. Miller's access to the victim were established well in advance of trial.

Eventually, Dr. Miller advised defense counsel that he would not be helpful to defendant's defense. In a report that Dr. Miller sent to defense counsel, which was admitted into evidence at the *Ginther* hearing, Dr. Miller explained that "the absence of being able to speak to the witness . . . and effectively evaluate him was detrimental to properly helping in the defense of Mr. Tilles."

Therefore, Dr. Miller "concluded that my professional opinion and/or testimony would not likely be helpful to his defense."[6]

During the *Ginther* hearing, defense counsel testified about her attempts to secure an expert witness for trial. She testified that she had concerns about the victim's competency because of his age,[7] and those concerns began "early on." She did not remember if Dr. Miller produced a report, but she remembered that she and Dr. Miller had a telephone call and exchanged emails, and after reviewing "everything," Dr. Miller "said he didn't feel that he could be helpful at trial," so he was not called to testify. When asked whether she considered "consulting an expert in child memory and suggestibility for this case," defense counsel responded: "I thought that's what Dr. Miller was going to consider along with everything else."

Defense counsel also tried to obtain the testimony of Dr. Patrick Ryan, who had evaluated the victim in 2013. After defense counsel informed the prosecutor that she intended to have Dr. Ryan testify, the prosecutor moved to limit or exclude that testimony. In response to that motion, defense counsel asserted that her theory of defense was that the victim had created a false memory. Defense counsel stated that Dr. Ryan's testimony would "describe the Court-ordered assessment he performed on [the victim] in 2013, along with his diagnoses and plan for treatment." Also, Dr. Ryan would "discuss how those various diagnoses (ADHD, bipolar or mood disorder) could have influenced the memories of someone with these issues." At a *Daubert* hearing, Dr. Ryan testified that he did not feel he could testify about false memories in children. At the end of that *Daubert* hearing, defense counsel said that Dr. Ryan should be allowed to testify about "the origins of these assessment tools [used with the victim], how they were conducted, . . . the function and purpose of each test, and the complaining witnesses (sic) statements as to each inquiry made by the doctor and the doctor's conclusions." Defense counsel did not seek to admit Dr. Ryan's testimony as that of an expert in child memory and suggestibility. The trial court concluded that Dr. Ryan could not testify as an expert. During trial, Dr. Ryan testified about his interaction with the victim in 2013. He was the only witness defendant presented at trial.

During the *Ginther* hearing, defendant presented the testimony of Dr. David Thompson, a child clinical psychologist. The parties stipulated to his expertise in forensic interviewing and in child memory and suggestibility. Dr. Thompson prepared a report that was given to the trial court. In that report, Dr. Thompson opined that had he "or a similarly qualified expert been retained as a defense expert, there are a number of areas in which I would have been able to assist in Mr. Tilles's defense." Specifically, he stated that "[a]n expert would have provided information about normal child development, memory, and sexual behavior that would have challenged the prosecutor's argument that [the victim] was accurately recalling and reporting events." His report furnished a detailed discussion about how memory works, especially in children, and how certain factors that were present in this case could impact the reliability of a child's memory and reporting of events.

---

[6] The letter is dated "11/08/2018," more than two months after the trial occurred in August 2018.

[7] The victim testified he was 5 or 6 years old at the time of the assault. He was 13 when he testified at trial.

Also, he opined that the forensic interview of the victim "deviated significantly from best practice child forensic interviewing guidelines."

After the hearing, the trial court observed that "[i]n his testimony and report, Dr. Thompson noted several crucial issues that, had they been presented at trial, may very well have altered the outcome of that trial." The trial court described Dr. Thompson's testimony as indicating "an expert would have been able to explain to the jury the intricacies of memory and development in children as they are not intuitive to those who have not studied the subject extensively." It emphasized that "[t]his information alone would have given the jury good reason to doubt the People's position that the complainant accurately recalled and reported the events at issue in this case." But the trial court concluded that defense counsel's performance had not fallen below an objective standard of reasonableness because she had done due diligence. Specifically, the trial court found that defense counsel's performance was not deficient because she had requested and received funding for an expert, sought an expert who was not able to help defendant, and tried unsuccessfully to admit the testimony of the doctor who had previously interviewed the victim. Because defense counsel had "sought multiple avenues by which to secure expert testimony that could have helped the jury understand the complex issues involved in this case," the trial court concluded that her efforts were not below an objective standard of reasonableness.

Here, the record reflected that expert testimony was available to help defendant and bolster his defense. But we must decide if defense counsel performed deficiently by failing to find such an expert and present that testimony at trial. The prosecution contends that the defense attorney's performance did not fall below an objective standard of reasonableness because she tried to obtain two experts, and "she cannot be faulted because the strategy proved unsuccessful." A trial strategy is not ineffective simply because it ultimately does not succeed. *White*, 331 Mich App at 149. But here, defense counsel understood the value of an expert witness at trial, as the entire defense rested on discrediting the victim and an expert could have furnished valuable testimony on that subject. Defense counsel chose to retain an expert "to determine the overall competency of the complaining witness" in Dr. Miller. At no time did she seek to retain an expert in the area of child memory and suggestibility. Moreover, defense counsel does not seem to appreciate the distinction among those various areas of expertise.

When she was asked at the *Ginther* hearing whether she considered "consulting an expert in child memory and suggestibility for this case," defense counsel answered: "I thought that's what Dr. Miller was going to consider along with everything else." But the order clearly stated that Dr. Miller was only appointed to evaluate the victim's competency. The limited nature of Dr. Miller's appointment is reinforced by his conclusion that his inability to speak with the victim rendered his testimony useless to the defense. If Dr. Miller was retained to provide expert testimony in the area of child memory and suggestibility, his testimony would have been helpful regardless of whether he was able to speak to the victim. The trial court arrived at that exact conclusion when it opined that "had Dr. Miller been retained for the purpose of testifying about memory and suggestibility, Dr. Miller would not have determined that his testimony would be of no value."

Defense counsel's confusion about the purpose for expert testimony was also on display at a hearing in February 2018, when she told the trial court she had a forensic expert who "is going to come in and testify as to the competency or lack of competency" of the victim. Defense counsel felt so strongly about the need for that expert testimony that she was prepared to move to withdraw

from the case when the trial court stated that it would not schedule the trial date far enough in the future to allow the expert to prepare. The prosecutor responded that such an expert was "wholly and completely inappropriate," insisting that what defense counsel actually wanted was an expert in "forensic interviewing protocol and potentially child suggestibility," and wondering "what other purpose expert (sic) can be offered in this circumstance." The trial court asked defense counsel if she wanted "the expert to testify . . . in general that that (sic) children don't remember," so defense counsel clarified that the expert testimony would relate to this victim specifically. Defense counsel advised the trial court that the expert "hasn't done his analysis yet" and that the expert "may come back and say no big deal," and that the victim is telling the truth. Here, defense counsel reinforced her belief that the relevant expert testimony was about whether this victim was testifying truthfully, rather than the general science of child memory and suggestibility that Dr. Thompson would later describe.

Contrary to the trial court's view, defense counsel's performance was not sufficient merely because she retained an expert. That expert was not retained for a purpose that would have helped the defense, and defense counsel was confused about the purpose for which that expert had been retained. Although defense counsel testified that she thought Dr. Miller was retained as an expert in "child memory and suggestibility," the record reveals that Dr. Miller was not retained for that purpose. We cannot excuse defense counsel's failure to secure this vital expert testimony simply because she tried unsuccessfully to secure an expert. Her attempts, even if successful, would not have yielded relevant expert testimony. The trial court found that defense counsel's performance in that respect did not fall below an objective standard of reasonableness because counsel "sought multiple avenues by which to secure expert testimony," but merely trying to obtain an expert who will testify at trial is not enough to defeat a claim of ineffective assistance when the attempt itself, and the response to the failure of that attempt, fell below an objective standard of reasonableness.

The failure to present an expert certainly "deprived the defendant of a substantial defense." *Payne*, 285 Mich App at 190. The need for an expert witness was obvious, and defense counsel appreciated that need. The defense rested entirely on the argument that the victim's memory was incorrect, and either the assault did not happen or, if it did, defendant was not the perpetrator. At trial, defense counsel pursued that defense without the benefit of any expert testimony to support the argument. The trial court acknowledged in its order that Dr. Thompson "noted several crucial issues that, had they been presented at trial, may very well have altered the outcome of that trial." Indeed, Dr. Thompson provided specific areas that he would have addressed in his testimony, both at a general level and in terms of the details of this case. The trial court correctly determined that, had those issues been presented at trial, they may very well have altered the outcome of defendant's trial. Therefore, defendant was prejudiced by defense counsel's ineffective assistance with respect to the testimony of an expert witness.

## D. FAILURE TO PRESENT EXCULPATORY LAY TESTIMONY

Next, defendant accuses his defense attorney of ineffective representation for failing to call Arielle Tilles and Curtis Payne to testify at trial. Defendant asserts that those two witnesses would have supported his theory that, to the extent the sexual assault occurred, he was not the perpetrator. The substance of what Tilles and Payne would have told the jury was presented during the *Ginther* hearing. There, Tilles testified that a man named Brandon, who spent time at the house during the relevant time period, was African American, liked hot sauce, had curly light brown hair, and had

-11-

light brown eyes. Tilles also testified that defendant had short finger nails. The victim's written description of the perpetrator stated he had long nails. She spoke with defense counsel on "several occasions" while defendant's case was pending, and she also spoke with defendant's investigator. Tilles said that Payne had given her information relevant to the case, and Tilles had provided that information to defense counsel "several times."

Defense counsel explained that she did not call Tilles as a witness because she was relying on defendant to choose which witnesses to call at trial. Defense counsel testified that she did not call Tilles because "[s]he wasn't present during the–the incident on the sofa at the time." She said that she would have called Tilles to testify if defendant had decided to call her as a witness. Although defense counsel testified that she did not present to defendant the possibility of calling Tilles to testify, defense counsel did not remember why she decided not to call Tilles. Defense counsel testified that she thought the only information Tilles could offer was "what a good brother [defendant] was." The trial court noted that Tilles's testimony "alone could have planted the seeds of reasonable doubt in the minds of the jury in what came down to a credibility contest."

Payne testified at the *Ginther* hearing that he witnessed an incident very similar to the one the victim described, but it was a man named Brandon, and not defendant, who was on the couch with the victim. Payne said he was at a family gathering outside the victim's biological mother's house when he heard the victim yelling from inside the house. When he went inside the house, he saw Brandon on the couch under a blanket with the victim. Payne said he had been interviewed by a police officer from the Warren Police Department as part of this case, and he told the officer about what he had seen with Brandon and the victim.

Payne said he spoke with defense counsel outside the courthouse on the first or second day of the trial. He told her what he had observed, that she should have contacted him, and that he was willing to testify if they needed him. Defense counsel testified that she did not remember speaking to Payne. Payne denied receiving any telephone call, text message, or letter about this case from an investigator. Payne said the only person who came to his house to inquire about the case was a CPS worker, although he acknowledged that frequently he cannot answer his telephone while he is working.

A report from defense counsel's investigator was admitted at the *Ginther* hearing. It stated that, on February 6, 2018, defendant told the investigator that Brandon was the actual perpetrator, and that a man named Payne had seen the incident with Brandon involved in the act.[8] Defendant asked the investigator to contact Payne. On the following day, the investigator spoke with Tilles and received Payne's telephone number. The report stated that, in February 2018, the investigator spoke with Brandon's cousin, Crystal, who suspected that Brandon was the person who should be investigated because she did not trust Brandon with her own children. The last entry in the report is dated March 2, 2018.

---

[8] This report also notes that a man named Keith also saw the incident. Keith did not testify at trial, but his lack of testimony is not at issue in this appeal.

In an e-mail exchange between defense counsel and the investigator that was admitted at the *Ginther* hearing, defense counsel outlined the potential defense that no sexual abuse occurred. Defense counsel suggested that, "as to Curtis [Payne] and keith, we argue that, IF it did happen, it was by somebody else." The investigator responded: "Curtis [Payne] and keith are not reliable." The investigator stated that neither man had "complied with my requests for interview/statement," and "I personally don't believe them and think that their relationship w (sic) client caused them to 'put that out there' thinking they would not be pressed to testify." But the investigator added that "[t]his is just my opinion though." Neither the e-mail nor the investigator's report describes his efforts to contact Payne. Additionally, it is unclear what formed the basis for the investigator's belief Payne was lying, especially in light of the fact that the investigator never spoke to Payne.

Defense counsel testified that she did not know what testimony Payne could have offered, and that she and her investigator both tried to reach him, but were unsuccessful. Defense counsel testified that she did not have a written statement from Payne, she had not talked to him, and she would normally not call a witness to the stand without talking to the witness or having a written statement from the witness. Defense counsel did not recall why she did not call Payne as a witness, but she noted that her investigator informed her that Payne was "not reliable."

Payne's testimony could have been crucial to the defense theory that the sexual assault was perpetrated by someone other than defendant. Addressing the significance of Payne's testimony, the trial court observed that "[n]ot only was his testimony the only foothold trial counsel had to point to a specific different suspect, but his recollection of the incident bore a striking resemblance to the complainant's own recollection and further removed Defendant's confession from having relevance to the proceedings." But defense counsel apparently gave up her effort to obtain Payne's testimony after she was informed by her investigator that Payne was "not reliable."

The trial court found that defense counsel's failure to present Payne's testimony to the jury was not objectively unreasonable because Payne did not present himself until trial was imminent and defense counsel "already had her strategy, witnesses, and opening and closing arguments ready to go." In such a high-stakes case, the trial court decided that it was reasonable for defense counsel "to determine that a variable such as [Payne]'s testimony would prove too risky" because "perhaps the People would be able to discredit him on cross-examination and undermine her whole case."

The trial court's analysis focused on defense counsel's reaction to Payne appearing outside the courthouse when trial was "imminent." But the trial court did not determine whether defense counsel's decisions about Payne's testimony were objectively reasonable in the months leading up to trial. The investigator knew about Payne and his eyewitness account of the incident in February 2018, and defense counsel had that information by March 2018 at the latest. The trial court noted that it "is unknown whether [the investigator's] efforts to contact [Payne] were sufficient to justify abandoning any further efforts," but Payne testified that the investigator did not text him, send him a letter, or stop by his house. The only evidence about efforts to contact Payne took the forms of the investigator's vague statement that he had made "requests for interview/statement" and defense counsel's testimony that both she and the investigator "tried reaching" Payne.

By March 2018 at the latest, defense counsel knew that there was a potential witness who had personally seen the incident and had stated that the perpetrator was not defendant. That same month, defense counsel suggested a theory that the assault was committed by someone else, which

-13-

could be supported by testimony from Keith or Payne. Defense counsel eventually presented that argument to the jury, but without the support of any witness testimony.

Here, we need not presume that the decision to forgo calling Payne as a witness was based on a sound trial strategy because defense counsel explained why she did not call Payne. Although defense counsel did not recall specifically why she did not call Payne, she explained that when she had her "investigator telling me that they're, in his professional opinion, that they were not reliable, then I would have given weight to that." Payne's testimony would have been particularly valuable to the defense, and it was objectively unreasonable to give up on presenting Payne's testimony on the basis of an unsupported allegation from the investigator. As the trial court stated in its opinion following the *Ginther* hearing, "the fact that [Payne] had previously reported this information to a detective at the Warren Police Department and that he had appeared at the trial stating that he was willing to testify belies [the investigator]'s assessment of his truthfulness and motive." Therefore, defense counsel was ineffective for failing to present Payne's testimony at trial.

Additionally, there appeared to be no communication issues with Tilles, whose testimony was not as strong as Payne's testimony but was nonetheless valuable to show that a different man, Brandon, matched the description the victim gave and also liked hot sauce. The prosecutor made much of the fact that the perpetrator liked hot sauce on his food. Additionally, Tilles would have testified that parts of the victim's description did not match defendant. Defense counsel's shifting explanations for not calling Tilles are concerning. At the *Ginther* hearing, she testified that (1) she did not call Tilles because Tilles was not an eye witness to the incident, (2) that it was defendant's decision, despite conceding that she did not present this as an option to defendant, and (3) that she did not remember why she did not call Tilles as a witness. On this record, the decision not to call Tilles was not the product of a sound trial strategy. See *Trakhtenberg*, 493 Mich at 52. Defense counsel was ineffective for this failure.

Finally, with respect to prejudice, the trial court accurately characterized the importance of Payne's testimony, so we conclude that there was a reasonable probability of a different outcome if Payne's testimony had been provided to the jury. In contrast, defense counsel's failure to present Tilles's testimony did not result in sufficient prejudice to defendant to warrant relief on appeal.

## E. VICTIM'S PRIOR INCONSISTENT STATEMENTS

Next, defendant asserts that he received ineffective assistance when defense counsel failed to impeach the victim using prior inconsistent statements. Decisions about questioning witnesses are presumptively matters of trial strategy. *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). But we cannot insulate defense counsel's performance from review merely by describing it as trial strategy. *Trakhtenberg*, 493 Mich at 52.

The victim participated in a forensic interview at the Care House on June 16, 2016. During that interview, the victim said that the sexual assault occurred when he was 2 or 3 years old, but at the trial he testified that it occurred when he was 4 or 5 years old. Also, in the interview, the victim said that he saw the perpetrator's penis, but at the trial he testified that he did not.

The transcript of the forensic interview is difficult to follow because it is not formatted like a transcript of a court proceeding. But the transcript makes clear that the victim told the interviewer

-14-

he was 2 or 3 years old when the sexual assault happened and he remembered he was 2 or 3 because of "the bathroom problems." At trial, the victim testified he was 4 or 5 years old when the assault occurred. He testified that he knew he was that age because it happened after he was hit by a car, which took place when he was 3, but before he turned 6, because that was when he went into foster care. On cross-examination, defense counsel did not bring up the contradictory statements in the forensic examination in response to that testimony. Additionally, the forensic interview transcript shows that the victim told the interviewer that he did not see the perpetrator's penis, but at trial he said that he did see the man's penis. At trial, defense counsel asked the victim if he saw the man's penis during the sexual assault, and the victim said that he did not. Defense counsel then asked if the victim "remember[ed] ever telling anybody in the past that" he had seen the man's penis, and the victim responded, "No." Defense counsel then moved on to a different line of questioning.

The trial court ruled that defense counsel was not ineffective because, although she did not impeach the victim with the forensic interview transcript, she tried to impeach the victim using the preliminary examination transcript. That analysis is flawed in two respects. First, defense counsel did not actually use the preliminary examination transcript to impeach the victim at trial. Defense counsel discussed the victim's preliminary examination testimony, but only briefly and not for the purpose of impeachment. For example, during cross-examination at trial, defense counsel asserted that during the preliminary examination, the victim did not recall defendant's name, and the victim agreed. In other words, there was a brief reference to previous testimony, but it was not part of an impeachment effort.

Second, on the matters of the victim's age and whether he saw the perpetrator's penis, the preliminary examination testimony was consistent with the victim's trial testimony, so an effort to impeach the victim's trial testimony with the preliminary examination testimony would have been pointless. Instead, impeachment on those matters based on the victim's statements provided at the forensic interview would have revealed inconsistencies. Indeed, during cross-examination at trial, defense counsel tried to impeach the victim by bringing up the discrepancy in age between his trial testimony and his forensic interview. But the prosecutor objected, asserting that it was "improper impeachment." And in response, defense counsel chose to withdraw the question and move on to another subject.

The victim's credibility was critical because the victim's testimony furnished the only basis for convicting defendant of penile penetration. At the *Ginther* hearing, defense counsel explained that she did not remember why she did not use the forensic examination transcript to impeach the victim, but she testified that it was "[p]artially because of the fact that it's not a certified transcript." She did not provide any other reason for failing to pursue that line of impeachment. On appeal, it is undisputed that the lack of certification is not an impediment to using the transcript at trial. We can think of no sound reason to forgo using the victim's prior inconsistent statements. Indeed, the only reason defense counsel offered for not impeaching the victim with his inconsistent statements from the forensic interview was based on a misunderstanding of the rules of evidence. Therefore, defense counsel's performance fell below an objective standard of reasonableness.

But relief on this basis is not proper because there is no reasonable probability that the trial would have ended in a different verdict if defense counsel had impeached the victim with his prior inconsistent statements from the forensic interview. In a credibility contest, this evidence certainly could have undermined the victim's credibility to some extent. But we are not convinced that such

impeachment would have damaged the victim's credibility to such an extent as to make a different outcome reasonably probable.

## E. VICTIM'S PRIOR CONSISTENT STATEMENTS

Defendant asserts that defense counsel was ineffective for failing to object to the victim's testimony about his own prior statements. Specifically, defendant identifies the victim's testimony describing the contents of a note that he had written that provided a description of the perpetrator—including his name, race, hair type and color, eye color, fingernails, and facial hair—in addition to a description of the assault. Although defendant raised this issue in his motion for a new trial, the trial court did not address the issue in its written opinion.

During the prosecutor's direct examination of the victim, she brought up a letter the victim had written that included details about the assault. In response to questioning from the prosecutor, the victim testified that, in the letter, he gave details about the perpetrator, including "what his hair color was, what his eye color was, . . . how tall he was . . . ," and that his name was "Kitty." The prosecutor then asked the victim if, in the letter, he "talk[ed] about what happened?" The victim said that he did, but that he did not remember. At that point, the victim was provided with a copy of the letter to refresh his memory. After reviewing the letter, the victim said that his memory was refreshed, and he then testified about what he had written in the letter about the assault and about the perpetrator.

On appeal, the prosecutor admits that the substance of the letter was inadmissible hearsay, but argues that the victim did not read from the letter; he only used the letter to refresh his memory and then testified about what he remembered. Refreshing a witness's recollection with any object that jogs the witness's memory is contemplated by MRE 612 and permitted by Michigan law. See *People v Thomas*, 359 Mich 251, 262-263; 102 NW2d 475 (1960) ("If, in truth, it is the desire of counsel merely to 'refresh' the recollection of a witness it may be done by permitting the witness himself to read the document intended to trigger the memory, under which procedure, of course, its content does not go before the jury[.]"). "A witness may refresh his or her recollection with a writing if there is a proper foundation."[9] *Genna v Jackson*, 286 Mich App 413, 423; 781 NW2d 124 (2009). In order "[t]o lay a proper foundation, the proponent must show that (1) the witness's present memory is inadequate, (2) the writing could refresh the witness's present memory, and (3) reference to the writing actually does refresh the witness's present memory." *Id*. "Where memory or recollection is being refreshed, the material used for that purpose is not substantive evidence." *People v Favors*, 121 Mich App 98, 109; 328 NW2d 585 (1982). "Rather, the material is employed to simply trigger the witness's recollection of the events." *Id*. The witness's recollection, once it is refreshed, "is substantive evidence and the material used to refresh is not." *Id*.

Here, before showing the victim's description of the sexual assault to the victim during his testimony at trial, the prosecutor asked him: "And do you remember what you put" in the letter he

---

[9] The object used to refresh recollection need not be a writing. If a baseball bat or a piece of cake jogs the witness's memory, showing that item to the witness is an appropriate method of refreshing recollection.

wrote about the events. After the victim responded "no" to that question, the prosecutor asked the victim: "would it refresh your memory to take a look at it?" The victim replied: "Yes." Then the prosecutor handed the letter to the victim, asked the victim to read the letter to himself, and finally asked him: "Is your memory now refreshed?" The victim said: "Yes." Then the prosecutor asked the victim: "what do you remember writing about, about the incident?" The process of refreshing recollection was proper, but the prosecutor went astray by asking the victim about the contents of the letter, as opposed to asking about what actually happened to the victim.

Although the prosecutor inappropriately elicited testimony about the contents of the letter, which constituted inadmissible hearsay, that error does not warrant relief on appeal. The defense attorney made no objection to that testimony, so the admission of the victim's testimony about the contents of the letter is subject to review only for plain error. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, and 3) the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Even if admission of the victim's testimony about the contents of the letter was plain error, it did not affect defendant's substantial rights. What mattered most at trial was the victim's description of the offense itself, not what the victim wrote about the offense years after it happened. Accordingly, we conclude that no relief is appropriate on review for plain error. Similarly, the failure of defense counsel to object to the victim's testimony about the letter's contents did not result in sufficient prejudice to support relief on a claim for ineffective assistance of counsel. Simply stated, we can find no "reasonable probability that the outcome [of defendant's trial ] would have been different" if defense counsel had objected to the prosecutor's questions and the victim's answers about the letter's contents. *Trakhtenberg*, 493 Mich at 51.

## F. JUROR SYMPATHY AND CIVIC DUTY

Defendant next argues that the prosecutor committed misconduct during closing argument by appealing to the jury's sympathies and its sense of civic duty. Alternatively, defendant insists his attorney was ineffective for failing to object to that part of the prosecutor's closing argument. Defendant cites the following comments as an improper appeal to juror sympathy or civic duty:

> After [the victim] testifies, he's not okay. He's angry, he's having fits of rage, and he's having nightmares. He's having nightmares. And I'm asking you, Ladies and Gentlemen of the Jury, to believe him, to convict the defendant, find him guilty, and I'm asking that you end these nightmares.

During rebuttal, the prosecutor asked the jury to "convict the defendant and hold him responsible for what he did to [the victim], and give [the victim] that relief."

"[T]o preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Defendant neither contemporaneously objected nor asked for a curative instruction in response to the alleged prosecutorial misconduct. Therefore, the issue of prosecutorial misconduct is unpreserved. All unpreserved claims of prosecutorial misconduct "are reviewed for plain error affecting substantial rights." *Id*.

The test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial. *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial." *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008) (citation omitted). They are permitted "to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Id*. (citation omitted). They are not required to "confine argument to the blandest possible terms." *Dobek*, 274 Mich App at 66. "A defendant's opportunity for a fair trial can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence." *Id*. at 63-64. Thus, appeals "to the jury to sympathize with the victim constitute improper argument." *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001). And the prosecutor "commits misconduct when he or she invites jurors to suspend their powers of judgment and decide the case on the basis of sympathy or civic duty." *People v Lane*, 308 Mich App 38, 66; 862 NW2d 446 (2014).

Here, evidence was admitted at trial that the victim was experiencing nightmares, PTSD, and anger issues, so that portion of the prosecutor's closing argument was supported by evidence. The prosecutor used that evidence to bolster the victim's credibility, and she was allowed to "argue from the facts that a witness is worthy of belief." *People v Clark*, 330 Mich App 392, 434; 948 NW2d 604 (2019). Indeed, the victim's credibility was critical because his testimony was the only evidence that could establish that the penile penetration occurred. Therefore, to the extent that the prosecutor argued from the evidence at trial about the victim's behavior to support his credibility, that was not improper.

But the prosecutor went beyond that, and asked the jury to "end [the victim's] nightmares" and "give [the victim] that relief." After the *Ginther* hearing, the trial court found that some of the prosecutor's statements were inappropriate and explained that it was "important not to understate the prejudicial impact statements such as those challenged by Defendant may have in a credibility contest such as this[.]" The trial court was correct. The requests the prosecutor made of the jurors raised an issue "broader than the defendant's guilt or innocence," *Dobek*, 274 Mich App at 63-64, and appealed "to the jury to sympathize with the victim." *Watson*, 245 Mich App at 591. Asking the jurors to give the victim relief and end his nightmares was not an argument that defendant was guilty as charged, but rather an appeal to the jurors to assist the victim by convicting defendant. Therefore, the comments were improper.

But the trial court further concluded that "these two statements alone were not sufficient to establish that Defendant's due process rights have been infringed or to warrant a new trial." In addition, any prejudice may have been ameliorated when the trial court instructed the jury that it "must not let sympathy or prejudice influence your decision." See *Watson*, 245 Mich App at 592 (explaining that such an instruction was given and concluding that reversal was not required). The trial court also instructed the jury to decide the case only on the basis of the evidence and that the lawyers' statements and arguments were not evidence. Jurors are presumed to follow instructions. *Unger*, 278 Mich App at 235. Like the trial court, we cannot conclude that those two comments, which were relatively brief, see *id*. at 237, affected defendant's substantial rights to such an extent that the unpreserved claim involves error requiring reversal.

Defendant claims that his attorney was ineffective for failing to object to those statements. At the *Ginther* hearing, defense counsel was read the contested portions of the prosecutor's closing argument, and she conceded that they did "sound problematic." Also, she acknowledged that she

did not recall why she did not object. But even if the prosecutor's remarks were improper, "defense counsel was certainly aware that there are times when it is better not to object and draw attention to an improper comment." *Id*. at 242 (quotation marks and citation omitted). "[D]eclining to raise objections, especially during closing arguments, can often be consistent with sound trial strategy." *Id*. Thus, defendant has not overcome the presumption that not objecting to those portions of the prosecutor's closing argument was sound trial strategy. See *Trakhtenberg*, 493 Mich at 52.

## F. CUMULATIVE ERROR

Finally, defendant contends that the cumulative effect of defense counsel's errors deprived him of a fair trial. "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *Dobek*, 274 Mich App at 106. Based on our review of the trial record, we conclude that the cumulative effect of the many errors that defense counsel made undermined confidence in the reliability of the verdict. Thus, defendant is entitled to a new trial.

Reversed and remanded for a new trial. We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Mark T. Boonstra
/s/ Christopher P. Yates